THE STATE, Appellant, v. PHILLIPS PIPE LINE COMPANY, a Corporation.—97 S. W. (2d) 109.

Court en Banc, October 2, 1936.*

*NOTE: Opinion filed at May Term, 1936, July 2, 1936; motion for rehearing filed; motion overruled at September Term, October 2, 1936.

460

*Roy McKittrick,* Attorney General, *Harry G. Waltner, Jr.,* and · *George B. Strother,* Assistant Attorneys General for appellant.

*R. H. Hudson, H. H. Booth, Stockard & Stockard, H. P. Robinson* and *Hilary D. Mahin* for respondent.

462

*Neale & Newman amicus curiae.*

COLLET, J.—This is an action brought by the Attorney General on behalf of the State of Missouri to collect corporation franchise taxes for the year 1934 in the amount of $1117.71 from the defendant Phillips Pipe Line Company. The respondent is a Delaware corporation authorized, on its application, to transact business in the State of Missouri as a foreign corporation. With the exception of three qualifying shares of a total of 1000 shares of capital stock it is wholly owned by the Phillips Petroleum Company. The Attorney General contends that Sections 4596 and 4641, Revised Statutes 1929, read together impose a privilege tax upon all corporations *authorized* to transact business within this State regardless of whether intrastate business is actually engaged in. He asserts further that even if the statute is not properly susceptible to that construction still respondent is actually engaged in intrastate business and is estopped to deny that fact. Respondent takes sharp issue with the Attorney

General's construction of Sections 4641 and 4596, supra, insisting that these statutes contemplate a tax only upon corporations actually engaged in intrastate business. It further denies that its business is in any respect intrastate in character or that it is estopped to assert and maintain that position and asserts that the imposition of the tax would constitute a burden upon interstate commerce in violation of the commerce clause of the Federal Constitution, and would further constitute a denial of respondent's rights under the "due process" clause of the Federal and State Constitutions.

The respondent operates an underground pipe line from Borger, Texas to East St. Louis, Illinois, with a branch line from Paola, Kansas, to Kansas City, Kansas. Petroleum products are introduced into the pipe line at Borger, Texas, Eldorado, Kansas, Paola, Kansas, and Kansas City, Kansas, and delivered at terminal points located at Wichita, Kansas, Jefferson City, Missouri, and East St. Louis, Illinois. Pumping stations are maintained at intervals along the line to maintain sufficient pressure to propel the product being transported. During the year 1934 the pipe line was devoted to the transportation of five commodities—butane, twenty-six-pound natural gasoline, straight run refinery gasoline, cracked gasoline and twelve-pound natural gasoline. None of these alone constitutes a satisfactory motor fuel but combined in proper proportions and mixed with other ingredients constitute different grades of gasoline sold for use in motor vehicles. Quantities of each product, described as "shipments" were transported for shippers under a tariff filed with the Interstate Commerce Commission, the terms of which will be referred to hereafter. The Phillips Petroleum Company is the only customer shipping to the Jefferson City terminal. Since that terminal is the only one located in Missouri the issues presented require our consideration of only the practices engaged in by defendant at this terminal and respondent's relations with the Phillips Petroleum Company. The Jefferson City terminal is located approximately two miles south of that city on a tract of land consisting of seventy acres owned by respondent. On this tract respondent has constructed a number of large tanks, several houses for the use of its employees, warehouses for the storage of supplies, office buildings, pumps and a system of interconnecting pipe lines between the various tanks for the purpose of moving the contents of one tank to another, water, electric and heating plants for the purpose of providing water, electricity and heat for use at the station and in the dwelling houses used by the resident employees, and private telephone lines for use in its business. The commodities above referred to are received at Borger and Pampa, Texas, and transported through the pipe line under high pressure to the Jefferson City terminal. These various commodities being of a different character, are transported separately

in quantities of not less than 50,000 barrels. Each product is discharged from the pipe line into storage tanks at the Jefferson City terminal in the amount directed by the shipper. The respondent transfers the proper amount of each product to what are designated as blending tanks where the different grades are mixed by the use of a blending spider, resulting in the production of a gasoline of the grade desired. In making one grade described as ethyl gasoline tetra-ethyl lead is injected into the gasoline in the blending tank. The tetra-ethyl lead is furnished by the shipper. It is shipped to Jefferson City in large quantities by rail at intervals of about six months. Being very dangerous to handle it is unloaded and transferred to respondent's storage tank under the supervision of representatives of the "Ethyl Corporation." Another grade of gasoline required the addition of coloring matter and still another of "whitening." As the desired quantity of each grade of gasoline is created it is transferred from the blending tank to a storage or "delivery" tank. Thus a quantity of the different grades of gasoline is made available to the shipper in the delivery tanks at all times. Although these delivery tanks were the property and under the care of the respondent it appears that the outlets were kept locked with the keys in the possession of the local superintendent of the Phillips Petroleum Company who supervised the withdrawal of the completed product from the delivery tanks to trucks belonging to his company for distribution to dealers purchasing it from the Petroleum Company. The superintendent of the respondent's Jefferson City terminal issued invoices in the name of the Petroleum Company for gasoline withdrawn from the delivery tank, and delivered them to the Petroleum Company's superintendent who, as above stated, supervised the withdrawals. All of the employees at the terminal were paid by respondent except the Petroleum Company's superintendent. The trucks were owned by the Petroleum Company and the drivers paid by that company. The written contract of carriage provided that the blending should be performed by the carrier. The charge therefor was included in the tariff rate. The published tariff fixed a rate to the Jefferson City terminal of 90½ cents per barrel from Borger and Pampa, Texas. This rate was described as the "local rate." The tariff also contained a schedule of rates which provided in effect that a different rate would be charged for the transportation of gasoline from Borger or Pampa, Texas, to the Jefferson City terminal on all gasoline which was forwarded within a year to any one of approximately 200 cities and towns in Missouri named in the tariff. That rate was designated the "proportional rate" and was fixed at 37 cents per barrel. The tariff provided for the payment of the "local rate" from the place of shipment to the Jefferson City terminal either in advance or before release from storage at the ter-

minal and a lien was impressed on the shipment for the charges. The application of the lower "proportional rate" to gasoline later removed therefore required an arrangement for a refund. The tariff provided for this by stating that a refund equal to the difference between the "local rate" of $90\frac{1}{2}$ cents and the "proportional rate" of 37 cents would be given on all quantities of gasoline removed within one year from storage by trucks upon the presentation of paid truck freight bills. The respondent did not transport gasoline from its terminal to any of the cities and towns named in the tariff, did not maintain any equipment therefor or have any arrangement with any connecting carrier to do so. Its responsibility for the gasoline ended with the delivery of the gasoline at the terminal. The freight bills issued for the movement of the gasoline from the terminal to the dealers located at the cities and towns named in the tariff showed the Petroleum Transportation Department as the carrier but respondent's witness Dixon testified that that part of the freight bill was fictitious as the Petroleum Transportation Department was only a department of the Petroleum Company. The Phillips Petroleum Company actually transported all gasoline withdrawn from the terminal in trucks belonging to it.

In compliance with statutory requirements respondent filed an annual report in the form required. That form contained a statement that respondent was engaged in intrastate business. Respondent, by interlineation, wrote into the statement that its business was wholly interstate and that it was therefore not subject to the Missouri Franchise Tax under authority of Ozark Pipe Line Corporation v. Monier, 266 U. S. 555.

At the close of all the evidence the trial court sustained respondent's demurrer and entered its judgment dismissing the petition. From that judgment plaintiff appeals.

Reverting to the Attorney General's contention that Sections 4596 and 4641, Revised Statutes 1929, impose a franchise tax upon the privilege of being a corporation and to conduct business as a corporation regardless of whether that privilege is exercised or the manner in which it may be exercised. That question is not decisive of this case. It is of slight consequence that the State may have the power to levy a franchise tax on a foreign corporation authorized to transact business in Missouri but which may not be doing so, unless the State has exercised that power by appropriate legislation. [Pennoyer v. Neff, 95 U. S. 714.] Has it done so? Our conclusion is that it has not. It is true that, as the Attorney General argues, the statute (Sec. 4596, supra) provides that every corporation for pecuniary profit formed in another state shall establish and maintain an office here and be subject to all the liabilities, restrictions and duties which are or may be imposed upon corporations of like character organized

under the laws of this State before such foreign corporation shall be authorized or permitted to transact business in this State, yet this act is of a general nature and is not dealing specifically with the levy of any tax. ■ Section 4641, supra, is a special act dealing particularly with this subject. The latter act provides:

"Every corporation not organized under the laws of this state, *and engaged in business in this state*, shall pay an annual franchise tax to the state."

This language is clear and unequivocal, deals specifically with the subject matter under consideration here, and must control. To hold otherwise would result, not only in permitting the general language of Section 4596, supra, to control the specific provision quoted, but would also result in the imposition of a tax without a clear and express statutory direction—a result not permitted. [State ex rel. Ford Motor Co. v. Gehner, 325 Mo. 24, 27 S. W. (2d) 1.]

Although the construction we place upon the statute makes it unnecessary to determine whether a franchise tax would be valid if imposed upon a foreign corporation authorized to transact business in Missouri and owning property here but which was engaged only in interstate commerce, yet we think it proper to note here that the case of Ozark Pipe Line Corp. v. Monier, 266 U. S. 555, 69 L. Ed. 439, relied upon by respondent as asserting that such a tax would not be valid under such circumstances, should not be relied upon as supporting that theory. It is true that in the Ozark Pipe Line case it is stated that the Corporation Franchise Tax Law of Missouri levies a tax "upon the privilege or right to do business," citing State ex rel. v. State Tax Commission, 282 Mo. 213, 221 S. W. 721, and that such a tax may not be imposed upon a corporation transacting only interstate business here, but we have construed the Corporation Franchise Tax Law as one imposing a tax upon the privilege or right to do business *as a corporation* (State v. Pierce Pet. Corp., 318 Mo. 1020, l. c. 1027, 28 S. W. (2d) 790; Mo. Athletic Assn. v. Inv. Corp., 323 Mo. 765, l. c. 773, 20 S. W. (2d) 51), and it has been frequently held that such a tax is not one which inevitably results in burdening interstate commerce although the business of the corporation taxed may be interstate. [St. Louis Ry. v. Hagerman, 256 U. S. 314; St. Louis-San Francisco Ry. Co. v. Middlekamp, 256 U. S. 226; Ashley v. Ryan, 153 U. S. 436, 38 L. Ed. 773; Postal Telegraph Cable Co. v. Adams, 155 U. S. 688, 39 L. Ed. 31.]

Although the statute contemplates the payment of this tax only by corporations engaged in business within this State, respondent cannot escape its payment if it is actually engaged in intrastate business. A great number of the multitude of cases bearing on the subject of what constitutes interstate and intrastate business have been cited and many are analyzed in the briefs. It would serve no good purpose

to review them here since the determination of this case, like the great majority of its kind, depends upon the conclusions to be drawn from the facts and not upon disputed principles of law. A number of grounds are assigned by the Attorney General as sufficient to compel the conclusion that respondent is shown to be engaged in intrastate business as a matter of law. These need not be considered separately as the various contentions all terminate in the one vital question—were the operations performed by respondent at its Jefferson City terminal necessarily incident to and therefore a part of the transportation? If they were, then respondent's entire business is interstate as it must be conceded that the movement of the gasoline from Borger or Pampa, Texas, to the Jefferson City terminal was interstate.

Respondent's position is that the shipper intended at the time the gasoline was delivered to respondent in Texas that it should be transported to the 200 cities and towns named in the "proportional rate" and that the blending of the various grades of gasoline into motor fuel, the storage of the blended gasoline, as well as its base ingredients, and any and all other operations at the Jefferson City terminal were but incidents necessary to the continuous flow of the commodities from Texas to the final destinations. The undisputed facts do not support that conclusion. While the terms of the tariff are not conclusive as to the character of the movement yet they may be considered in determining that fact. The tariff fixes rates from Borger and Pampa, Texas, to the Jefferson City terminal alone. One of these rates, characterized the "local rate" applies to all shipments at the time of their initial consignment. By the terms of the tariff it must be paid in advance or before the shipment is withdrawn from storage at the terminal. When the shipment arrives at the terminal it must be "received" by the shipper or consignee "with all possible dispatch into tanks to be provided by the shipper or consignee." Item 15 of the "General Regulations and Conditions" of the tariff provides that delivery will be made at the terminal point. Item 60 thereof provides that gasoline will be received for transportation only when the shipper or consignee has provided the necessary facilities for receiving the gasoline as it arrives at the terminal. The shipper maintained no tanks at the terminal. Thus according to the terms of the tariff and the undisputed evidence the respondent "delivered" each shipment to the consignee in respondent's own tanks. Demurrage is provided for if shipments are not "received" after twenty-four hours, but after each is received by the consignee in respondent's tanks a rebate equal to the difference between the local rate of 90½ cents and the "proportional rate" of 37 cents will be made to the shipper if the gasoline is reshipped by truck within one year. Therefore, it appears that final delivery is made immedi-

ately upon arrival at the terminal, although that delivery is made in tanks actually furnished by respondent. Respondent offered evidence to the effect that it would lose the business of its owner, the Phillips Petroleum Company, if it did not perform the blending operations. It was asserted in oral argument in this court that the rendering of such services was necessary to meet railroad competition. If that be correct then the blending operations were performed as an accommodation to the shipper to secure the business and not as a necessary incident to transportation. The bills of lading which were used when gasoline was withdrawn from the delivery tanks were issued by respondent's representative in the name of the Petroleum Company as shipper and at the direction of a representative of the Petroleum Company. The fiction was indulged in of designating the carrier in these bills of lading as the Petroleum Transportation Company, but the idea that another carrier performed the transportation from the terminal was exploded when respondent's witness testified that the Petroleum Transportation Company was only a department of the Petroleum Company and that the equipment and employees engaged in those movements were the Petroleum Company's. It is not shown that the character of the products require their blending in order that they may be transported.

We are unable to find support in this record for the conclusion that the blending operations and the storage of the finished products were a part of the transportation as necessary incidents thereto. The undisputed facts show that the interstate movement ceased when the gasoline was delivered to the consignee at the Jefferson City terminal prior to the blending operation and that the blending and storage of the finished product constituted the transaction of intrastate business.

The point is made that the assessment and judgment of the Tax Commission in assessing the franchise tax against respondent contravenes the due process clause of the Federal and State Constitutions. The same question was presented in St. Louis-San Francisco Ry. v. Middlekamp, 256 U. S. 226, where it was held that there was no denial of due process.

The conclusion reached on the questions determined herein makes the consideration of other propositions presented unnecessary. The judgment is reversed and the cause remanded with directions to enter judgment for the plaintiff in accordance with the petition. All concur.