STATE v. CONTINENTAL OIL COMPANY.
STATE v. MID-CONTINENT PETROLEUM CORPORATION.
STATE v. SINCLAIR REFINING COMPANY.
STATE v. PHILLIPS PETROLEUM COMPANY.
STATE v. SKELLY OIL COMPANY.
STATE v. THE TEXAS COMPANY.
STATE v. CITIES SERVICE OIL COMPANY.
STATE v. BARECO OIL COMPANY.[1,2]

July 14, 1944.

No. 33,607.

[1]Reported in 15 N. W. (2d) 542.

[2]*Certiorari* denied by United States Supreme Court January 29, 1945.

*J. A. A. Burnquist,* Attorney General, *George B. Sjoselius,* Assistant Attorney General, *James F. Lynch,* County Attorney, and *Andrew R. Bratter,* Assistant County Attorney, for the State.

*Hayner N. Larson, Raymond A. Scallen,* and *Faegre & Benson,* for respondents.

PETERSON, JUSTICE.

This appeal by the state from the judgments in separate proceedings against each defendant to enforce payment of personal property taxes for the years 1933 to 1940, inclusive, involves the question whether gasoline belonging to them in the tanks of a pipeline company is subject to taxation by the state where the gasoline was transported in interstate commerce by pipe line from points outside the state to the tanks located in the state for processing, storage pending receipt of orders for its sale and distribution, and reshipment by rail to defendants' stations and customers within and without the state to fill the orders received pending the storage. In the case of the Phillips Petroleum Company, a separate question is raised as to the taxability of certain high volatile gasoline used at the tank farm in connection with blending the gasoline shipped by pipe line to prepare it for use. It has been assumed that if the first question is answered in the affirmative the decision will be determinative of this second one also.

The defendants are producers, refiners, and marketers of gasoline and other petroleum products, having their refineries in Texas and in the so-called mid-continent field, which includes parts of Oklahoma, Kansas, and Missouri. They produce six or seven basic grades of gasoline, which is transported interstate from the refineries by the Great Lakes Pipe Line Company, a stock-owned-and-

controlled corporation of the defendants and certain others in the same business, through its pipe lines to a so-called tank farm located at the Minnesota Transfer in Ramsey county, this state. The tank farm is a terminal consisting of numerous large tanks with capacities ranging upwards to 82,000 barrels each, with suitable connections and equipment to receive gasoline shipped by pipe line, to process and store it in the manner herein mentioned, and to reship it by rail. At the time of trial, the tank farm had a capacity of 621,000 barrels or about 26,000,000 gallons.

At the time of delivery to the pipe line and receipt at the tank farm the gasoline is not suitable for the market. The octane count for the market must be at least 70. That of all gasoline shipped is much less than 70, most of it being in a low 60, and some of it as low as 58. Consequently, all gasoline shipped must be raised to the required octane count. This is done by adding tetraethyl lead to each shipment after determining by chemical analysis the amount to be added. In addition, such ingredients as coloring, oils, and, in the case of some defendants, solvents and high volatile gasoline are added. This processing requires several hours. Coloring is added simply by dumping a handful of coloring matter into a tank car of gasoline. The addition of the other ingredients requires some mixing and the use of special devices designed for the purpose. The tetraethyl lead is added by running the gasoline through a "spider" which mixes the lead with the gasoline as it passes through. This operation requires about 6½ hours. By means of the processing, the six or seven basic grades shipped by pipe line are changed into 26 different kinds of gasoline ultimately to be sold to the trade. The pipe-line company furnishes the facilities, except for certain tanks of two of the defendants, and the labor in connection with the processing. The defendants furnish the lead, coloring, oils, solvents, and high volatile gasoline.

The shipment is made from the refineries to the tank farm under bills of lading in which the shipper is named as consignor and consignee and the destination is given as the Minnesota Transfer. The pipe-line company is an interstate common carrier. It has

filed regular tariffs and charges the shippers regular tariff rates. While the pipe-line company is regarded by the interstate commerce commission as a common carrier, its processing and storage of gasoline and its property used for such purposes is not, because the commission determined:

"This extra handling of the gasoline is a manufacturing or trade service rather than a transportation service.

"Accordingly, all property owned by the carriers and used in blending gasoline has been classified in this report as owned but used for purposes other than those of a common carrier."

The gasoline of a particular shipper may be commingled with the gasoline of the same grade of other shippers. Tenders of shipments are made in such amounts and at such times as to insure an adequate supply of gasoline to meet each shipper's trade needs. When the gasoline arrives at the tank farm it is allocated to the defendants by the pipe-line company. A stock on hand to meet the trade requirements of at least 35 days is carried by each defendant.

The gasoline is reshipped by rail from the tank farm to bulk stations owned either by the defendants, their contract customers, or "spot" customers. The latter are purchasers who have had no previous contracts with the defendants. Their purchases amount to less than one percent of the gasoline handled at the tank farm. Experience has shown that about 75 percent of the gasoline is delivered to points in Minnesota and 25 percent to points in Wisconsin, North Dakota, and South Dakota. The four states comprise what defendants call the "northern area." On the average, gasoline is reshipped from the tank farm 35 days after its arrival. This period is necessitated by the processing and awaiting of orders from bulk stations and spot customers. The rail reshipment is made as a separate shipment under a regular rail bill of lading in which the shipper is named as consignor and either itself or its customer to whom shipment is made as consignee. The bill of lading contains a statement of the state of origin of the gasoline shipped under it.

The tariff rates include a charge not only for the transportation of the gasoline, but for the services rendered by the pipe-line company in processing, storing, loading rail cars, and further transportation by rail from the "terminal point [the tank farm] to ultimate destination." The processing, storage, and loading rail cars are characterized in the tariffs as rendered "in transit"—that is, while the gasoline is en route from the refineries to its ultimate destination by rail shipment from the tank farm. The railroads are not parties to the arrangement. The rate established by pipe line from the refineries to the tank farm and by rail from the tank farm to the "ultimate destination" is the same as the all-rail rate from the refineries to the place of ultimate destination. Apparently, the rail rate from the tank farm to the ultimate destination is higher than the proportional rate for the same distance on an all-rail basis. To equalize the pipe-line-rail rate from refinery to ultimate destination with that actually charged under the separate pipe-line and rail tariffs, the pipe-line company rebates to shippers the difference between the rail rate and the proportional rate for the actual rail transportation. Apparently this practice is sanctioned.

Each defendant has what is called a traffic department, which receives orders for the gasoline while it is in storage and allots it to various bulk stations and customers in approximately 200-barrel lots. After the gasoline is allotted, the pipe-line company is directed to make the proper rail shipment for which the shipper has paid the railroad in advance.

When the gasoline is delivered to the pipe line outside the state, it is destined ultimately for the consignor's trade throughout the northern area, but neither the defendants nor the pipe-line company know at that time the particular bulk stations or customers or the particular places to which the gasoline is to be reshipped from the tank farm. In fact, the only destination known at that time is the tank farm. The ultimate destination is to be determined by the traffic department of each shipper as and when orders for gasoline are received by it.

Defendants claim that the storage and processing at the tank farm are necessary to insure safe transportation of the gasoline by the pipe line, because tetraethyl lead is dangerous to human beings. The evidence is that it is a dangerous substance when handled as a separate one, but there was no evidence that it was dangerous to handle when mixed with gasoline. On the contrary, the evidence tends to show that there is no particular danger from handling gasoline containing tetraethyl lead. Defendants offered evidence to the effect that it is *uncertain* whether it is dangerous to handle gasoline containing tetraethyl lead and that, for that reason, the lead is added at the tank farm rather than at the refineries.

There is no substantial conflict in the evidence. The dispute revolves around the conclusions to be drawn therefrom.

Among other things, the trial court found that gasoline was stored in the terminal tanks to await orders from the shippers' own bulk plants and contract customers. As a conclusion of law, it determined that the gasoline while at the tank farm was in interstate transit and not subject to state taxation. Judgments were entered in favor of the defendants, and the state appeals.

On the appeal only the sixth finding stands unchallenged. The others are assailed as unsupported by the evidence and as being in the nature of conclusions resulting from the application of what the trial court conceived to be the governing rules of law to the undisputed facts of the case.

■ At the outset it is important to bear in mind that we are dealing with a nondiscriminatory state property tax. Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 78 L. ed. 131.

■ This being a case arising under the constitution of the United States, it is our plain duty to apply the rules laid down by the Supreme Court of the United States. Glover v. Minneapolis Bldg. Trades Council, 215 Minn. 533, 10 N. W. (2d) 481, 147 A. L. R. 1071. In determining what its rules are and in applying them we are bound by that court's appraisal of its decisions.

It is always to be remembered that state taxes upon interstate commerce are invalid, because they conflict with the power of congress to regulate commerce among the states. Interstate commerce is under the control of congress and free from restriction by the states save as it may constitutionally ordain. In determining whether a state property tax is in conflict with the regulatory power of congress over interstate commerce, certain rules have been well established. The states may not tax property *in transit* in interstate commerce. This is true because the flow of goods in interstate commerce is under the control of congress and free from restrictions which it has not ordained. It is equally true that exemption from state taxation of goods transported in interstate commerce depends upon continuity of transit.

"* * * But, by reason of a break in the transit, the property may come to rest within a State and become subject to the power of the State to impose a non-discriminatory property tax. Such an exertion of state power belongs to that class of cases in which, by virtue of the nature and importance of local concerns, the State may act until Congress, if it has paramount authority over the subject, substitutes its own regulation." Minnesota v. Blasius, 290 U. S. 1, 9, 54 S. Ct. 34, 37, 78 L. ed. 131, 135.

The necessary consequence is as held in numerous decisions and as said in General Oil Co. v. Crain, 209 U. S. 211, 229, 28 S. Ct. 475, 482, 52 L. ed. 754, 765: "Property, therefore, at an intermediate point between the place of shipment and ultimate destination may cease to be a subject of interstate commerce" and consequently become subject to state taxation.

The question, then, is: What is *continuity of transit?* Plainly, it means that the transportation is proceeding and that the goods are being moved. But, in order to afford protection from state restriction upon interstate commerce and hence immunity from state taxation, the interstate movement is regarded as continuing despite *temporary* interruptions (1) because of the necessities of the journey, or (2) for the purpose of safety and convenience in the course of the movement. Champlain Realty Co. v. Town of

Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. ed. 309, 25 A. L. R. 1195 (logs held during high water to insure safety of the journey) ; Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. ed. 626 (oil held to accumulate a cargo and await a ship to transport it). Where, however, the goods have come to rest for causes serving the purposes of the owner of the goods, they have ceased to be the subject of interstate commerce and are subject to nondiscriminatory state taxation. Property transported in interstate commerce and ultimately destined for points beyond that at which the journey is interrupted, which has "come to rest within a State, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the State, or for shipment elsewhere, as his interest dictates," is not in interstate commerce and is to be "deemed to be a part of the general mass of property within the State," and as such is subject to state taxation. Minnesota v. Blasius, 290 U. S. 1, 10, 54 S. Ct. 34, 37, 78 L. ed. 131, 136, *supra.*

In the instant case, the gasoline was at rest in the tanks; it was not in *actual* transit. It cannot be held to be in transit because of a temporary interruption of the journey due to the necessities of the journey or for the purpose of convenience and safety. A concession that there might be, as defendants claim, an uncertainty whether transportation by pipe line of gasoline containing tetraethyl lead is dangerous does not establish that the processing, storage, and distribution at the tank farm were due to such fact. It appears without dispute that other ingredients were added to some of the gasoline. The ultimate destination of the gasoline was unknown at the time of shipment from the refineries and delivery at the tank farm and was to be determined, while it was being held in storage at the tank farm, by orders for shipment to bulk stations and other customers, depending on where they were located. The gasoline was held for shipment and disposition as the interests of the owners dictated. In Atlantic Coast Line R. Co. v. Standard Oil Co. 275 U. S. 257, 269, 48 S. Ct. 107, 110, 72 L. ed. 270, 275, where oil transported in ships was unloaded into tanks for ultimate delivery to unascertained customers in the interior of the state (as

the gasoline here was to be delivered to unascertained bulk stations and customers in the so-called northern area), Mr. Chief Justice Taft said:

"The important controlling fact in the present controversy, and what characterizes the nature of the commerce involved, is that the plaintiff's whole plan is to arrange deliveries of all of its oil purchases on the seaboard of Florida so that they may all be there stored for convenient distribution in the state to the 123 bulk stations and to fuel oil plants in varying quantities according to the demand of the plaintiff's customers, and thence be distributed to subordinate centers and delivery stations, and this plan is being carried out daily. There is neither necessity nor purpose to send the oil through these seaboard storage stations to interior points by immediate continuity of transportation. The seaboard storage stations are the natural places for a change from interstate and foreign transportation to that which is intrastate, and there is nothing in the history of the whole transaction which makes them otherwise, either in intent or in fact. There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages of the plaintiff company at Tampa, Port Tampa, Jacksonville or the St. Johns River Terminal. Everything that is done after the oil is deposited in the storage tanks at the Tampa destinations, or at the Jacksonville destinations, is done in the distribution of the oil to serve the purposes of the plaintiff company that imported it. Neither the sellers who deliver the oil, nor the railroad company that aids the delivery of the oil to the storage tanks and tank cars at the seaboard, has anything to do with determining what the ultimate destination of the oil is, or has any interest in it, or has any duty to discharge in respect to it, except that the railroad company, after the storage in Florida has been established for the purposes of the plaintiff company, accepts the duty of transporting it in Florida to the places designated by the plaintiff company."

In numerous cases the rule has been settled that property transported in interstate commerce, which has come to rest and is held

in storage either for sale or for use or for distribution, is not *in transit,* but is part of the mass of the property within the state and as such is subject to state taxation, although it was intended at the inception of the interstate movement to reship the property from the point where the interstate movement was interrupted to a point beyond as its ultimate destination. Southern Pac. Co. v. Gallagher, 306 U. S. 167, 59. S. Ct. 389, 83 L. ed. 586; Federal. C. & W. Co. v. McLean, 291 U. S. 17, 54 S. Ct. 267, 78 L. ed. 622; Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 78 L. ed. 131; Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U. S. 249, 53 S. Ct. 345, 77 L. ed. 730, 87 A. L. R. 1191; Atlantic Coast Line R. Co. v. Standard Oil Co. 275 U. S. 257, 48 S. Ct. 107, 72 L. ed. 270; Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co. 249 U. S. 134, 39 S. Ct. 237, 63 L. ed. 517; Susquehanna Coal Co. v. City of South Amboy, 228 U. S. 665, 33 S. Ct. 712, 57 L. ed. 1015; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. ed. 615; General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. ed. 754; American Steel & Wire Co. v. Speed, 192 U. S. 500, 24 S. Ct. 365, 48 L. ed. 538, 100 A. S. R. 827; Pittsburg & So. Coal Co. v. Bates, 156 U. S. 577, 15 S. Ct. 415, 39 L. ed. 538; Brown v. Houston, 114 U. S. 622, 5 S. Ct. 1091, 29 L. ed. 257; Missouri Pac. R. Co. v. Schnipper (D. C.) 51 F. (2d) 749, affirmed (7 Cir.) 56 F. (2d) 30; State v. Bartles Oil Co. 132 Minn. 138, 155 N. W. 1035, L. R. A. 1916D, 193; State v. Maxwell Motor Sales Corp. 142 Minn. 226, 171 N. W. 566; State ex rel. Burr v. Seaboard A. L. Ry. Co. 92 Fla. 61, 109 So. 656. Reference to but a few of the cited cases will show, if that is necessary, in view of the decision in the Standard Oil case (275 U. S. 257, 48 S. Ct. 107, 72 L. ed. 270), that the gasoline here in question was part of the mass of the property within the state and subject to state taxation.

In Bacon v. Illinois, 227 U. S. 504, 516, 33 S. Ct. 299, 303, 57 L. ed. 615, 620, *supra,* the court said that the intention of the owner to reship grain after *stoppage in transitu* for the purpose of inspecting, weighing, grading, mixing, etc., "did not *alter the fact that it [the grain] had ceased to be transported"* and that the shipper *"had established a local facility* in Chicago for his own benefit and

while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the State in an assessment for taxation which was made in the usual way without discrimination." (Italics supplied.)

In Susquehanna Coal Co. v. City of South Amboy, 228 U. S. 665, 668, 33 S. Ct. 712, 714, 57 L. ed. 1015, 1016, *supra,* it was said of the storage of coal in the yards for the purpose of keeping a supply on hand to fill anticipated orders that "there was something more than the submission to delay in transportation and the acceptance of its consequences. The situation was made a facility of business, a business conducted [as here] through agents and employes."

As pointed out in the Blasius case, 290 U. S. at p. 12, 54 S. Ct. 38, 78 L. ed. 137, it was said in Champlain Realty Co. v. Town of Brattleboro, in distinguishing Bacon v. Illinois, *supra:* "His *storing of the grain was not to facilitate interstate shipment of the grain, or save it from the danger of the journey."* (Italics supplied.) Nor did the processing, storage, and distribution of the gasoline at the tank farm in the instant case have that result. State v. Phillips Pipe Line Co. 339 Mo. 459, 97 S. W. (2d) 109, affirmed, 302 U. S. 642, 58 S. Ct. 53, 82 L. ed. 499.

In General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. ed. 754, *supra,* oil shipped in interstate commerce to a warehouse where it was stored pending reshipment to fill orders in other states for which it was ultimately destined was held to be subject to state taxation.

In American Steel & Wire Co. v. Speed, 192 U. S. 500, 24 S. Ct. 365, 48 L. ed. 538, 100 A. S. R. 827, *supra,* the court held that property shipped in interstate movement to a transfer company, which was to take charge of it upon arrival and *sort, store,* and *deliver* it in the original packages either as generally or specifically directed by the shipper to its recognized and approved customers for whom the goods were ultimately destined, was when stored in the warehouse no longer *in transit,* but had reached its destination and was subject to state taxation.

In State v. Bartles Oil Co. 132 Minn. 138, 155 N. W. 1035, L. R. A. 1916D, 193, *supra,* we held that gasoline shipped into the state in tank cars and unloaded into tanks, where it was mixed with other gasoline, and there held for sale to customers in and outside the state, ceased to be the subject of interstate commerce and had become a part of the mass of the property within the state so as to be subject to state inspection and the fees charged therefor. We there reviewed and followed the decisions of the Supreme Court of the United States, including such cases as General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. ed. 754; Susquehanna Coal Co. v. City of South Amboy, 228 U. S. 665, 33 S. Ct. 712, 57 L. ed. 1015; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. ed. 615; and C. M. & St. P. Ry. Co. v. Iowa, 233 U. S. 334, 34 S. Ct. 592, 58 L. ed. 988.

The determination of the interstate commerce commission that the handling of the gasoline at the tank farm was not a transportation, but a manufacturing or trade service, and that its property used for such service was for a purpose other than as a common carrier is but a logical application of the governing rules of law to the facts of the case. Such a determination by that authority is entitled to great weight.

It is immaterial that the pipe-line company undertook, as part of the shipping arrangement, not only the transportation by itself by pipe line from the refineries to the tank farm, but also that by rail from the tank farm to the point of ultimate destination. Since the rail carriers were not parties to the arrangement, the transportation was not by through pipe-line-rail transportation. Atlantic Coast Line R. Co. v. Standard Oil Co. 275 U. S. 257, 48 S. Ct. 107, 72 L. ed. 270. But, if it were assumed that there was through pipe-line-rail transportation, it would make no difference. Where a shipment is made under a through bill of lading on a through rate with right of *stoppage in transitu,* stoppage of the transportation by the owner of the goods renders them subject to state taxation if the stoppage is not due to necessities of the journey or for the purposes of safety and convenience in the course of the

movement, but for the owner's purposes, either to process, to sell, or to distribute the same. Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co. 249 U. S. 134, 39 S. Ct. 237, 63 L. ed. 517, *supra* (stoppage of timber at a mill for purposes of manufacturing it into lumber, storage pending receipt of orders from customers in other states, and reshipment to them under the original bill of lading upon receipt of orders) ; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. ed. 615, *supra* (withdrawal of grain shipped from southern and western states to New York at Chicago for purposes of inspecting, weighing, cleaning, clipping, drying, sacking, grading or mixing, or changing the consignee).

The fact that the gasoline was part of a flow of commerce otherwise subject to congressional regulation, which in this case was simply a regulation of the rates charged by the pipe-line company and by the railroads for transportation, does not affect the right of the state to impose nondiscriminatory property taxes. Federal C. & W. Co. v. McLean, 291 U. S. 17, 54 S. Ct. 267, 78 L. ed. 622 (Federal Warehousing Act, 7 USCA, § 241, *et seq.*) ; Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 78 L. ed. 131 (Sherman Anti-Trust Act, 15 USCA, §§ 1-7, 15 note, and Packers and Stockyards Act, 7 USCA, § 181, *et seq.*) ; Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. ed. 839 (Grain Futures Act, 7 USCA, § 1, *et seq.*).

The fact that here the gasoline was in the possession of the pipe-line company on the taxing day is of no importance. See, Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 78 L. ed. 131 (cattle in stockyards) ; Susquehanna Coal Co. v. City of South Amboy, 228 U. S. 665, 33 S. Ct. 712, 57 L. ed. 1015 (coal in piles in railroad yards).

Nor was the gasoline *in transit* while being processed, stored, distributed, and loaded onto cars at the tank farm because of the fact that the pipe-line company's tariffs provided for a charge for these services upon that basis. Parties cannot by contract make a transaction interstate commerce which is essentially intrastate in its nature. Mr. Justice Stone, the present Chief Justice, in Federal

C. & W. Co. v. McLean, 291 U. S. 17, 22, 54 S. Ct. 267, 269, 78 L. ed. 622, 627, said:

"The fact that appellant's contract with the interstate rail carrier has designated appellant as the carrier's agent and appellant's warehouse as the carrier's depot cannot alter the legal consequences of what is actually done with the cotton by its owners or of their power of control over it, or of the actual course of dealing with it by appellant. It is not within the power of the parties, by the descriptive terms of their contract, to convert a local business into an interstate commerce business protected by the interstate commerce clause."

We have examined the cases cited by defendants, but none of them are in point. Because they are numerous, we shall refer to but a few of them out of regard for space. Some involve a tax on property in actual interstate transit or in the carrier's possession for immediate movement as soon as its facilities (a pipe line) will permit, as in Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 42 S. Ct. 101, 66 L. ed. 227. Here, the transit was ended. Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. ed. 626, and Texas & N. O. R. Co. v. Sabine Tram Co. 227 U. S. 111, 33 S. Ct. 229, 57 L. ed. 442, were distinguished in Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U. S. 249, 266-267, 53 S. Ct. 345, 349-350, 77 L. ed. 730, 737-738, 87 A. L. R. 1191, 1198-1200, upon the ground that in those cases the whole shipment was destined for foreign countries and consequently they were not applicable where, as here, no "ascertainable part of the gasoline" had a destination beyond the state. The instant case is stronger for state taxation, because not only no ascertainable part of the gasoline was destined for reshipment beyond the state of Minnesota, but no destination for any part thereof was known or had been ascertained. Furthermore, in the cited cases storage was due to necessary delay while accumulating a cargo and waiting for ships, whereas here there was no delay for either purpose; rail transportation was at all times available. Some of the cited cases, like Southern Pac. Terminal Co. v. I. C. C. 219 U. S. 498, 31 S. Ct. 279, 55 L. ed. 310, involve

the extent of the power of congress to regulate interstate commerce. The cited case involved the question of the right of congress to prohibit a carrier from granting a shipper a preference by leasing to him a pier and improvements thereon to manufacture cotton-seed into cake for foreign shipment. The Supreme Court of the United States has emphasized that cases involving the reach of federal power are of no particular value as precedents in determining whether a particular business apart from the statutory regulation constitutes interstate commerce. A. B. Kirschbaum Co. v. Walling, 316 U. S. 517, 62 S. Ct. 1116, 86 L. ed. 1638. As said in Chicago Board of Trade v. Olsen, 262 U. S. 1, 34, 43 S. Ct. 470, 476, 67 L. ed. 839, 849: "It was held that this [regulation under the Packers and Stockyards Act] could be done *even though the sales and purchases* by commission men and by dealers *were in and of themselves intrastate commerce,* the parties to sales and purchases and the cattle all being at the time within the city of Chicago." (Italics supplied.) Substantially the same observation was made in Atlantic Coast Line R. Co. v. Standard Oil Co. 275 U. S. 257, 48 S. Ct. 107, 72 L. ed. 270.

Furthermore, most of the cases cited by the defendants, such as Southern Pac. Terminal Co. v. I. C. C. 219 U. S. 498, 31 S. Ct. 279, 55 L. ed. 310; Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 42 S. Ct. 101, 66 L. ed. 227; Champlain Realty Co. v. Town of Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. ed. 309, 25 A. L. R. 1195; Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. ed. 626; and Texas & N. O. R. Co. v. Sabine Tram Co. 227 U. S. 111, 33 S. Ct. 229, 57 L. ed. 442, are cited and classified in such decisions as Southern Pac. Co. v. Gallagher, 306 U. S. 167, 59 S. Ct. 389, 83 L. ed. 586; Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 78 L. ed. 131; and Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U. S. 249, 53 S. Ct. 345, 77 L. ed. 730, 87 A. L. R. 1191, where it is pointed out that the cases cited by defendants have no application in a fact situation such as is here involved.

Our conclusion is that the gasoline came to rest at the tank farm so as to become a part of the mass of the property within the state

and subject to state taxation. Under the circumstances, reshipment of the gasoline by rail to other points in the so-called northern area did not establish a continuity of movement, and consequently the gasoline was not *in transit* at the time the tax in question was imposed.

There is no room here for a finding that the processing and storage at the tank farm and subsequent distribution facilitated the interstate movement or constituted a temporary interruption of the interstate movement due to the necessities of the journey or for purposes of safety and convenience in the course of the movement. The plain fact is that processing, storage, and distribution neither facilitate nor impede transportation, but are separate local activities engaged in by the shippers to suit their convenience and necessities. A. L. A. Schechter Poultry Corp. v. United States, 295 U. S. 495, 55 S. Ct. 837, 79 L. ed. 1570, 97 A. L. R. 947; Federal C. & W. Co. v. McLean, 291 U. S. 17, 54 S. Ct. 267, 78 L. ed. 622; Atlantic Coast Line R. Co. v. Standard Oil Co. 275 U. S. 257, 48 S. Ct. 107, 72 L. ed. 270. The only intent which the court may consider is an objective one disclosed by the ultimate facts which are not in dispute. As said in Western Oil Refining Co. v. Lipscomb, 244 U. S. 346, 349, 37 S. Ct. 623, 624, 61 L. ed. 1181, 1184: "Ordinarily the question whether particular commerce is interstate or intrastate is determined by what is actually done * * *."

The findings that the processing and storage facilitated interstate transportation are opposed to the undisputed facts and are but inferences in the nature of conclusions made by the trial court by applying to them what it conceived to be applicable rules of law. Such findings of fact are not entitled to any more weight than a conclusion of law made by a trial court. As said in Country Club D. S. Co. v. Village of Edina, 214 Minn. 26, 32, 8 N. W. (2d) 321, 325:

"* * * When findings of fact are couched in general terms that anticipate the result and disclose that they are colored by an

erroneous conception of the law applicable, this court will not give them the weight to which they are ordinarily entitled."[3]

What we said concerning a similar conclusion which the trial court stated was a finding of fact in the case of S. R. A., Inc. v. State, 213 Minn. 487, 500, 7 N. W. (2d) 484, 490, applies here:

"Finding No. 13, so-called, was not within the stipulated facts. It was inserted by the court on its own motion. It is without support as a finding of fact and amounts to no more than a conclusion of law. The facts being without dispute otherwise, it may be stricken as irrelevant to the issues."

The state is entitled to judgment for the taxes in question.

Reversed with directions to enter judgment in favor of the state in accordance with the views stated herein.

THOMAS GALLAGHER, JUSTICE (dissenting).

The pipe-line facilities are adaptable to the shipment of approximately six different types of gasoline. Only one type can be pumped through at a time. Subsequent to its arrival at the Minnesota Transfer, the six original specifications of gasoline are further processed to produce 26 different specifications. The blending and mixing operations in connection therewith require the use of special equipment and tanks, all of which are owned by the pipe-line company with the exception of certain tanks owned by three of the defendants. For various reasons it is impractical for the pipe-line company to ship tenders of gasoline in other than substantial lots. None of the defendants have facilities either at the

[3]In Baumgartner v. United States, 322 U. S. 665, 671, 64 S. Ct. 1240, 1243, the Supreme Court of the United States said:

" * * * Finding so-called ultimate 'facts' more clearly implies the application of standards of law. And so the 'finding of fact' even if made by two courts may go beyond the determination that should not be set aside here. Though labeled 'finding of fact,' it may involve the very basis on which judgment of fallible evidence is to be made. Thus, the conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of 'fact' that precludes consideration by this Court."

Minnesota Transfer or in their bulk plants of sufficient capacity to handle and store any one such shipment. In consequence, the pipe-line company maintains the large storage accommodations at the Minnesota Transfer.

The trial court in its findings determined:

That the receiving tanks and other equipment of the pipe-line company at the Minnesota Transfer were maintained incidental to the receipt of gasoline through the pipe line and its subsequent reshipment by rail, since it was not practical for the pipe-line company to transfer units of gasoline smaller in quantity than 20,000 barrels, and since such amounts far exceeded the capacity of any single bulk plant owned by any of the defendants or their customers here;

That the expansion of the six basic grades into the more numerous blends involved merely adding one or more materials such as dye, lubricant, natural gasoline, or lead, and that, while equipment therefor was maintained by defendants in their refineries in the Mid-Continent oil field, because transportation by the pipe-line company made it impractical and dangerous so to process the gasoline prior to its shipment over the pipe line, the pipe-line company maintained the equipment for and performed the processing and blending operations at the Minnesota Transfer solely in facilitation of its system as a common carrier of gasoline;

That it was intended by defendants that all gasoline upon arrival in Minnesota by pipe line should be delivered into the custody of connecting common carriers for further carriage by rail to bulk plants owned by defendants or their contract customers, and that all gasoline so delivered was actually so reshipped with the exception of approximately 1¼ percent, which was sold and reshipped by rail to "spot sale" customers in purchases not contemplated at the time of the original shipment;

That the pipe-line company maintained large tankage facilities and stored the gasoline upon arrival at the Minnesota Transfer to protect itself at all times against orders for reshipment until it

was able again to move tenders of gasoline delivered to it by the defendants.

On the basis of such findings, as indicated, the trial court determined that the personal property taxes in question were unlawful and in violation of the federal constitution.

■ The fundamental question for determination here is whether the gasoline in the tanks of the pipe-line company at the Minnesota Transfer on May 1 of each of the years involved was still in transit in interstate commerce, or whether it had come to rest as a part of the general mass of property in the state and hence was subject to local taxation. This, in turn, would seem to be dependent upon whether there is sufficient evidence to sustain the trial court's findings (1) that said oil shipments had not reached their final destination at the Minnesota Transfer; (2) that the interruptions and delays at the Minnesota Transfer were for the facilitation of transportation and hence for the benefit of the carrier rather than the shipper; and hence that said shipments were not subject to local taxation at the time.

The principles governing the situation presented are concisely set forth in 15 C. J. S., Commerce, § 104, as follows:

"Property while actually in transit in interstate commerce is not taxable by the state of origin, the state of destination, or intermediate states, * * *. To be immune from local taxation the commodity must be in actual continuous transit in interstate commerce, the crucial question being continuity of transit, *but the goods are not necessarily subject to local taxation because of a temporary interruption or cessation of movement, such as a break in the continuity of the journey to facilitate, or in the furtherance of, transportation. Whether goods become subject to local taxation at the point where their movement has been interrupted must be determined from the surrounding circumstances at the time, including various factors such as the intention of the owner and the occasion or purpose of the interruption. It is not controlled by the nature of the billing or the lack of knowledge of the ultimate destination*

*at the time of shipment,* or by the fact that the goods at the point of interruption may be under the control of the owner with power to withdraw or divert the goods. After reaching their destination, goods become subject to local taxation although intended for subsequent sale or shipment in interstate commerce." (Italics supplied.)

As previously suggested, the questions involved appear to be questions of fact rather than law (see Railroad Comm. v. Worthington, 225 U. S. 101, 32 S. Ct. 653, 56 L. ed. 1004), and hence we are governed by the well-established rule that if there is evidence sufficient reasonably to sustain the findings referred to the judgments of the trial court must be affirmed.

■ An examination of the record indicates that there is ample evidence to sustain the trial court's finding that the oil shipments were interstate in character and were destined for a point beyond the Minnesota Transfer. The fact that at the time of the original shipment the ultimate destination of the oil was unknown to the shippers except in a general way did not necessarily result in the termination of the interstate character thereof at the Minnesota Transfer. Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. ed. 626; Texas & N. O. R. Co. v. Sabine Tram Co. 227 U. S. 111, 33 S. Ct. 229, 57 L. ed. 442; G. C. & S. F. Ry. Co. v. Mathis (Tex. Civ. App.) 194 S. W. 1135; Missouri Pac. R. Co. v. Schnipper (D. C.) 51 F. (2d) 749, affirmed (7 Cir.) 56 F. (2d) 30.

Defendants presented substantial testimony that the Minnesota Transfer was not intended as the final destination of the gasoline in question, but that it was ultimately intended for their bulk plants or those of their contract customers beyond said terminal, and that this was known to the representatives of the pipe-line company at the time the oil was tendered for shipment. This was corroborated by evidence of a long course of practice by defendant shippers with reference to such pipe-line shipments which established that all of them continued beyond the Minnesota Transfer. As to the specific oil stocks here in question, the evidence clearly established that all of them were subsequently reshipped from the

Minnesota Transfer to the bulk plants with the exception of about 1¼ percent thereof, which was sold at the Minnesota Transfer in "spot sales" not previously contemplated. This small amount would not necessarily affect the character of the entire shipment. Railroad Comm. v. Worthington, 225 U. S. 101, 32 S. Ct. 653, 56 L. ed. 1004, *supra.*

The record contains some 600 pages of printed testimony, presented for the most part by defendants, a substantial portion of which relates directly to the question of the intent of the shippers to continue the oil stocks in question beyond the Minnesota Transfer. This testimony appears sufficient to sustain the trial court's finding that the oil stocks here involved had not reached their final destination when they arrived at the Minnesota Transfer, but that they were destined for a point beyond the Transfer.

It has frequently been held that interruption of an interstate shipment for purposes of transportation does not necessarily subject the shipment to local taxation, nor does the power of the owner to divert a shipment after the inauguration of its journey necessarily take it out of the class of interstate commerce. Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. ed. 626, *supra.* On the other hand, it has been determined that if such interruption is for the benefit of the shipper rather than the carrier, the property may become subject to local taxation even though the merchandise in question may be subsequently reshipped in accordance with the original intent of the shipper. Susquehanna Coal Co. v. City of South Amboy, 228 U. S. 665, 33 S. Ct. 712, 57 L. ed. 1015.

From this it would seem that we again have a fact question for review, and that we must determine here whether the evidence reasonably tends to sustain the trial court's finding that the delay at the Minnesota Transfer was to facilitate transportation, and hence was for the benefit of the carrier rather than the shipper. This presents somewhat more difficulty than the finding first considered here. Careful examination of the voluminous testimony indicates that the trial court might have found that such delays and inter-

ruptions were for the benefit of the shipper rather than the carrier and hence that the oil stocks were subject to local taxation. On the other hand, there is substantial evidence reasonably to sustain the finding that the delays at the Minnesota Transfer were to facilitate transportation. Testimony was presented that numerous specifications in small amounts could not be shipped over the pipe line because of the high rate of contamination resulting when small shipments were made, and that it was practical, therefore, for the pipe-line company to handle only large shipments of 20,000 barrels or more; that this factor limited pipe-line shipments to six or seven specifications, which the carrier subsequently raised to 26 at the Minnesota Transfer by the mixing and blending processes it conducted there. It would seem a matter of little concern to the shipper whether the additional specifications were created before shipment or at the Minnesota Transfer, so long as it received oil of the quantity and quality tendered and specified for shipment and delivery. It follows that the mixing and blending operations could well have been for the benefit of the carrier and to enable it to accept for shipment numerous specifications which it would otherwise have to reject because of the added expense and loss entailed in small quantity shipments.

The evidence further disclosed that the blending and mixing operations were for the most part rather simple; that the dye or coloring matter added to the gasoline is required by state law where tetraethyl lead is added to the gasoline and that the adding of such dye is accomplished simply by dumping a handful of coloring matter into the tank after the arrival of the gasoline at the terminal; that the other mixing processes are equally simple, with the exception of that involving the addition of tetraethyl lead, which requires more equipment and is somewhat more complicated.

With reference to this operation, testimony was presented that the carrier, without difficulty, could have performed such operation prior to shipment except for the fact that it was of the opinion that after lead had been added to gasoline it became dangerous to anyone coming in contact with it and that if lead were added be-

fore shipment some 100 additional employes of the carrier would become exposed to the risk of infection therefrom; and hence, as a matter of convenience and safety, that the lead was not added until the gasoline arrived at the Minnesota Transfer.

Further testimony was presented that gasoline was shipped in large quantities for the additional reason that it was necessary for the pipe-line company to have on hand at the Minnesota Transfer sufficient quantities at all times to meet orders of the shippers for delivery of gasoline previously tendered but not yet received here because the carrier was required to await additional tenders to permit shipments in the large volumes previously referred to.

The blending or mixing processes do not in themselves result in altering the interstate character of shipments. The manufacturing or concentration of an interstate or foreign shipment en route may be but an incident in the transshipment, and does not necessarily change the interstate or foreign character thereof. See, Southern Pac. Terminal Co. v. I. C. C. 219 U. S. 498, 31 S. Ct. 279, 55 L. ed. 310.

As previously stated, since the purpose of the delay constitutes a question of fact, and since, as above summarized, there is substantial evidence to sustain the trial court's finding that the purpose here was to facilitate transportation and for the benefit of the carrier, I feel the trial court's determination should be affirmed. Southern Pac. Terminal Co. v. I. C. C. *supra;* Western Oil Refining Co. v. Lipscomb, 244 U. S. 346, 37 S. Ct. 623, 61 L. ed. 1181; Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 42 S. Ct. 101, 66 L. ed. 227; Champlain Realty Co. v. Town of Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. ed. 309, 25 A. L. R. 1195; Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. ed. 626, *supra;* West Virginia Pipe Line Co. v. State, 95 W. Va. 285, 120 S. E. 759; Berwind & White Coal Co. v. Jersey City, 75 N. J. L. 76, 67 A. 181; State ex rel. Hirschi v. Empire O. & R. Co. 171 Okl. 138, 42 P. (2d) 127.

The authorities relied upon by the state may be distinguished from the case at hand. In State v. Phillips Pipe Line Co. 339 Mo.

459, 468, 97 S. W. (2d) 109, 113, affirmed, 302 U. S. 642, 58 S. Ct. 53, 82 L. ed. 499, the court stated:

"We are unable to find support in this record for the conclusion that the blending operations and the storage of the finished products were a part of the transportation as necessary incidents thereto."

Here, as previously suggested, there is evidence reasonably sustaining the finding that the blending operations were incident to the transportation and for the benefit of the carrier.

In Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 78 L. ed. 131, the shipper had no intention of transporting the cattle beyond South St. Paul. At that point the original shipment terminated and title passed to Blasius, who was taxed prior to his reshipment of the cattle. The original shipment had ended at South St. Paul. Here, the original shipment was not intended to terminate at the Minnesota Transfer but beyond that point in the bulk plants indicated.

In Superior Oil Co. v. Mississippi ex rel. Knox, 280 U. S. 390, 396, 50 S. Ct. 169, 170, 74 L. ed. 504, 508, the court held that after gasoline had come into the hands of the purchaser it had come to rest. As the court stated, there was not the "great universal stream * * * from the state of purchase to a market elsewhere," which might "affect the legal conclusion by showing the manifest certainty of the destination."

In Prairie Oil & Gas Co. v. Jefferson County (5 Cir.) 76 F. (2d) 545, the court held that as to the oil detained for the purpose of enabling the owner to avail itself of the opportunity to sell before further delivery for interstate transportation, there was a break in the continuity which made the same subject to local taxation.

In Atlantic Coast Line R. Co. v. Standard Oil Co. 275 U. S. 257, 269, 48 S. Ct. 107, 111, 72 L. ed. 270, 275, where the controlling factor subjecting the shipments to local taxation was the intent on the part of the shippers to terminate the interstate character of the shipments at the Florida seaboard and there to rearrange for sales and further deliveries after the interstate movement had terminated, the court stated: "There is nothing to indicate that

the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages."

In Susquehanna Coal Co. v. City of South Amboy, 228 U. S. 665, 33 S. Ct. 712, 57 L. ed. 1015, a specific finding that the delay in shipment was for the benefit of the shipper rather than the carrier was sustained by the evidence and controlled the court's decision. Therein it was pointed out that the delay resulted in benefits to the shipper and was not for the facilitation of commerce.

In State ex rel. Railroad Commrs. v. Seaboard Air Line Ry. Co. 92 Fla. 61, 77, 109 So. 656, 662, *certiorari* dismissed, 275 U. S. 577, 48 S. Ct. 141, 72 L. ed. 435, the court found evidence that the oil had come to rest in accordance with the original intent of the shippers, and "that storage * * * is for their convenience and subsequent disposition of the commodity; that all, or any portion, of it may be resold in fact and diverted from the original destination of it; that it is held there for the profit of the companies by sales of a large portion, or all of it, to customers with whom at the time of the original shipment they have no contract." In the instant case, on the contrary, the shippers' original intent was to ship beyond the Minnesota Transfer to their own bulk stations or to their contract purchasers.

■ Plaintiff urges that, notwithstanding the status of the gasoline which was processed and reshipped, there were here involved certain stocks of natural gasoline used exclusively for blending purposes, and that as to these stocks the evidence was conclusive that their interstate character had terminated and they had come to rest at the Minnesota Transfer so as to be subject to the tax levied against them. The amount thereof is relatively small compared with the remaining gasoline here involved. It would seem, however, that, since it was contemplated by the shippers that this natural gasoline would ultimately be added to the other gasoline and thereafter reshipped with it, it likewise can be said that such gasoline had not as yet come to rest or reached the destination ultimately intended for it.

Under the authorities cited and on the basis of the evidence here presented, I am of the opinion that the trial court's findings have sufficient foundation in the evidence and that the judgments should be affirmed. Shipment of oil by pipe line cannot readily be compared with shipments of oil or other merchandise by either rail or water. Facts and circumstances which require delay in rail or water transportation ordinarily indicate that such delay is for the convenience of the shipper rather than the carrier. The very nature of oil transportation by pipe line would normally seem to require delays, storage, and additional processing for the carrier's benefit to eliminate liability for loss by reason of contamination incident to shipment in small quantities, and to eliminate the danger to health and safety in connection with the various mixing processes required in obtaining the different specifications offered or required for transport by the shippers. The imposition of a state tax before the final culmination of the journey in the midst of delays necessary to facilitate this method of transportation would seem to place thereon unnecessary burdens and restrictions retarding its development and increasing to the shipper and ultimately the consumer the cost of this otherwise convenient and economical method of oil carriage.

LORING, CHIEF JUSTICE (dissenting).

I concur in the dissent of Mr. Justice Thomas Gallagher.

MR. JUSTICE STREISSGUTH took no part in the consideration or decision of this case.