## MINNESOTA *v.* BLASIUS.

No. 7.   Argued October 11, 1933.—Decided November 6, 1933.

2

*Mr. Harry H. Peterson,*

*Mr. D. L. Grannis* for respondent.

4

Mr. Chief Justice Hughes delivered the opinion of the Court.

Respondent, George Blasius, is a trader in livestock at the St. Paul Union Stockyards in South St. Paul, Minnesota. On May 1, 1929, he owned and had in his possession in these yards eleven head of cattle which were assessed for taxation as his personal property, under the general tax law of the State. In this action, brought to collect the tax, Blasius defended upon the ground that the cattle were in course of interstate commerce, and a part of that commerce, and were not subject to state taxation. The Supreme Court of the State, overruling the decision of the trial court, sustained this defense, and this Court granted certiorari. 187 Minn. 420; 245 N.W. 612; 289 U.S. 717.

The material facts, as found by the trial court, are these: At the St. Paul Union Stockyards, thousands of head of livestock arrive daily by railroad and truck and are promptly sold and moved. The livestock comes from the State of Minnesota and other States throughout the northwest. The class of livestock which Blasius buys on the market are those that go immediately thereafter into the hands of feeders or growers within and without the State of Minnesota and principally beyond the borders of that State. He has not dealt in livestock for immediate slaughter. Thus, it was the practice of Blasius to go upon the market at the stockyards and buy livestock to meet the requirements of his trade, and in the regular course of his business practically all cattle purchased by him were sold and shipped to non-residents of the State,

although selling and shipping to residents of the State did sometimes occur.

The eleven head of cattle in question came to the yards from some point outside the State of Minnesota; they had been consigned to commission firms for sale at the South St. Paul market; the consignors "had no intent to transport said cattle to any other place than South St. Paul, nor did they have any intent that such cattle should be transported to any particular place after their sale"; they were bought by Blasius from the commission merchants on April 30, 1929, and on May 1, 1929, the tax date, they were owned by him and "had not been entered with any carrier for shipment to any point," but were being offered for sale on the market; seven of the eleven head were sold on that day to a non-resident purchaser and were immediately shipped by the purchaser to points outside the State of Minnesota; the remaining four head were similarly sold and shipped on the following day. After his purchase Blasius placed the cattle in pens leased by him from the stockyards company; he paid for their feed and water up to the time of resale.

The court found that Blasius was not "subject to any discrimination in favor of cattle solely the product of the State of Minnesota"; that the assessment was made at the regular time and in the usual manner for taxation of personal property within the State; that the transportation of the cattle ceased after purchase from the commission men; that the cattle were not held by Blasius for the purpose of promoting their safe or convenient transit but were purchased and held by him because he desired to make a profit at their resale; that they were held at his pleasure and that he would sell to anyone, resident or non-resident, who was the highest bidder; that Blasius did not buy the cattle for the purpose of export or shipment to another State; and that after their purchase by him, and until he resold, the cattle were "at absolute and

complete rest in the yards at South St. Paul " and " were a part of the general mass of cattle in the State and locally owned." The court also found that the cattle were " handled by the defendant as a part of the chain of title from the original producer thereof to the final consumer thereof," and that such handling was " a necessary factor in the center of chain of commerce from West to the East and South."

The dealings at the South St. Paul stockyards including the transactions of Blasius, as described in these findings, manifestly were so related to a current of commerce among the States as to be subject to the power of regulation vested in the Congress. Applying the cardinal principle that interstate commerce as contemplated by the Constitution " is not a technical legal conception, but a practical one, drawn from the course of business," this Court said, in *Swift & Co.* v. *United States,* 196 U.S. 375, 398, 399: " When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce." In that case, the question was as to the reach of the federal power through the prohibitions of the Anti-Trust Act of July 2, 1890 (26 Stat. 209), and these were held to apply to an attempt to monopolize commerce among the States by " a combination of independent dealers to restrict the competition of their agents when purchasing stock for them in the stockyards." On the same fundamental principle, the Court sustained the Packers and Stockyards Act of 1921 (42 Stat. 159) providing for the supervision by federal authority of the business of commission men and livestock dealers in the great stockyards of the country. *Stafford* v.

*Wallace,* 258 U.S. 495.[1] It was in deference to these decisions that the state court denied validity to the tax here assailed. 187 Minn., p. 426.

But because there is a flow of interstate commerce which is subject to the regulating power of the Congress, it does not necessarily follow that, in the absence of a conflict with the exercise of that power, a State may not lay a non-discriminatory tax upon property which, although connected with that flow as a general course of business, has come to rest and has acquired a situs within the State. The distinction was recognized in *Stafford* v. *Wallace, supra,* pp. 525, 526, where the Court cited, as an illustration, the case of *Bacon* v. *Illinois,* 227 U.S. 504, in which such a non-discriminatory property tax was sustained. And the Court in the *Stafford* case quoted from the opinion in the *Bacon* case (*supra,* p. 516) the following statement of the distinction: " The question " (that is, as to the validity of the state tax) " it should be observed, is not with respect to the extent of the power of Congress to regulate interstate commerce, but whether a particular exercise of state power in view of its nature and operation must be deemed to be in conflict with this paramount authority."

The States may not impose direct burdens upon interstate commerce, that is, they may not regulate or restrain that which from its nature should be under the control of the one authority and be free from restriction save as it is governed in the manner that the national legislature constitutionally ordains. This limitation applies to the exertion of the State's taxing power as well as to any other interference by the State with the essential freedom of in-

---

[1] See, also, *Eureka Pipe Line Co.* v. *Hallanan,* 257 U.S. 265; *United Fuel Gas Co.* v. *Hallanan,* 257 U.S. 277; *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U.S. 282; *Lemke* v. *Farmers Grain Co.,* 258 U.S. 50; *Hill* v. *Wallace,* 259 U.S. 44, 69; *Board of Trade* v. *Olsen,* 262 U.S. 1, 37, 38, 41.

terstate commerce. Thus, the States cannot tax interstate commerce, either by laying the tax upon the business which constitutes such commerce or the privilege of engaging in it, or upon the receipts, as such, derived from it.[2] Similarly, the States may not tax property in transit in interstate commerce.[3] But, by reason of a break in the transit, the property may come to rest within a State and become subject to the power of the State to impose a non-discriminatory property tax. Such an exertion of state power belongs to that class of cases in which, by virtue of the nature and importance of local concerns, the State may act until Congress, if it has paramount authority over the subject, substitutes its own regulation.[4] The " crucial question," in determining whether the State's taxing power may thus be exerted, is that of " continuity of transit." *Carson Petroleum Co. v. Vial,* 279 U.S. 95, 101.

If the interstate movement has not begun, the mere fact that such a movement is contemplated does not withdraw the property from the State's power to tax it. *Coe v. Errol,* 116 U.S. 517; *Diamond Match Co. v. Ontonagon,* 188 U.S. 82. If the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the

[2] *Robbins v. Shelby Taxing District,* 120 U.S. 489; *Fargo v. Michigan,* 121 U.S. 230; *Philadelphia & Southern Mail S.S. Co. v. Pennsylvania,* 122 U.S. 326; *Minnesota Rate Cases,* 230 U.S. 352, 400; *Pullman Co. v. Richardson,* 261 U.S. 330, 338; *Sprout v. South Bend,* 277 U.S. 163; *New Jersey Telephone Co. v. Tax Board,* 280 U.S. 338; *Anglo-Chilean Corp. v. Alabama,* 288 U.S. 218.

[3] *Coe v. Errol,* 116 U.S. 517; *Kelley v. Rhoads,* 188 U.S. 1; *Minnesota Rate Cases,* 230 U.S. 352, 400, 401; *Eureka Pipe Line Co. v. Hallanan,* 257 U.S. 265; *United Fuel Gas Co. v. Hallanan,* 257 U.S. 277; *Champlain Co. v. Brattleboro,* 260 U.S. 366; *Hughes Bros. Co. v. Minnesota,* 272 U.S. 469; *Carson Petroleum Co. v. Vial,* 279 U.S. 95.

[4] *Minnesota Rate Cases,* 230 U.S. 352, 400, 402, *et seq.*

course of the movement. *Coe* v. *Errol, supra; Kelley* v. *Rhoads,* 188 U.S. 1; *Champlain Co.* v. *Brattleboro,* 260 U.S. 366. Formalities, such as the forms of billing, and mere changes in the method of transportation do not affect the continuity of the transit. The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied. *Champlain Co.* v. *Brattleboro, supra,* p. 377; *Southern Pacific Terminal Co.* v. *Interstate Commerce Comm'n,* 219 U.S. 498; *Texas & N. O. R. Co.* v. *Sabine Tram Co.,* 227 U.S. 111; *Carson Petroleum Co.* v. *Vial, supra.* The mere power of the owner to divert the shipment already started does not take it out of interstate commerce if it appears " that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation." *Hughes Bros. Co.* v. *Minnesota,* 272 U.S. 469, 476.

Where property has come to rest within a State, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the State, or for shipment elsewhere, as his interest, dictates, it is deemed to be a part of the general mass of property within the State and is thus subject to its taxing power. In *Brown* v. *Houston,* 114 U.S. 622, coal mined in Pennsylvania and sent by water to New Orleans to be sold there in the open market, was held to have " come to its place of rest, for final disposal or use," and to be " a commodity in the market of New Orleans," and thus to be subject to taxation under the general laws of the State; although the property might, after arrival, be sold from the vessel on which the transportation was made for the purpose of shipment to a foreign port. As the Court said in *Champlain Co.* v. *Brattleboro, supra,* p. 376, the coal in *Brown* v. *Houston* " was being held for sale to anyone who might

wish to buy." A similar case is *Pittsburgh & Southern Coal Co.* v. *Bates,* 156 U.S. 577. In *General Oil Co.* v. *Crain,* 209 U.S. 211, the company conducted an oil business at Memphis where it gathered oil from the North and maintained an establishment for its distribution. Part of the oil was deposited in a tank, appropriately marked for distribution in smaller vessels in order to fill orders for oil already sold in Arkansas, Louisiana and Mississippi. The Court held that the first shipment had ended, that the storage of the oil at Memphis for division and distribution to various points was "for the business purposes and profit of the company"; and that the tank at Memphis had thus become a depot in its oil business for preparing the oil for another interstate journey. This decision followed the principle announced in *American Steel & Wire Co.* v. *Speed,* 192 U.S. 500. See *Champlain Co.* v. *Brattleboro, supra,* p. 375; *Atlantic Coast Line R. Co.* v. *Standard Oil Co.,* 275 U.S. 257, 270; *Carson Petroleum Co.* v. *Vial, supra,* pp. 104, 105.

In *Bacon* v. *Illinois, supra,* Bacon, the owner of the grain and the taxpayer, had bought it in the South and had secured the right from the railroads transporting it to remove it to his private grain elevator for the purpose of inspecting, weighing, grading, mixing, etc. He had power to change its ownership, consignee or destination, or to restore the grain, after the processes above mentioned, to the carrier to be delivered at destination in another State according to his original intention. The Court held that, whatever his intention, the grain was at rest within his complete power of disposition, and was taxable; that "it was not being actually transported and it was not held by carriers for transportation"; that the purpose of the withdrawal from the carriers "did not alter the fact that it had ceased to be transported and had been placed in his hands"; that he had "the privilege of continuing the

transportation under the shipping contracts, but of this he might avail himself or not as he chose. He might sell the grain in Illinois or forward it as he saw fit." What he had done was to establish a " local facility in Chicago for his own benefit; and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the State in an assessment for taxation which was made in the usual way without discrimination." *Id.*, p. 516. In *Champlain Co.* v. *Brattleboro, supra,* p. 375, the court thus restated the point of the *Bacon* case: " His storing of the grain was not to facilitate interstate shipment of the grain, or save it from the danger of the journey." " He made his warehouse a depot for its preparation for further shipment and sale. He had thus suspended the interstate commerce journey and brought the grain within the taxable jurisdiction of the State." See, also, *Susquehanna Coal Co.* v. *South Amboy,* 228 U.S. 665, 669, and *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U.S. 249, 266.

The case of Blasius is a stronger one for the state tax than that of Bacon. Here the original shipment was not suspended; it was ended. That shipment was to the South St. Paul stockyards for sale on that market. That transportation had ceased, and the cattle were sold on that market to Blasius, who became absolute owner and was free to deal with them as he liked. He could sell the cattle within the State or for shipment outside the State. He placed them in pens and cared for them awaiting such disposition as he might see fit to make for his own profit. The tax was assessed on the regular tax day while Blasius thus owned and possessed them. The cattle were not held by him for the purpose of promoting their safe or convenient transit. They were not in transit. Their situs was in Minnesota where they had come to rest. There was no federal right to immunity from the tax.

*Judgment reversed.*