BOROUGH OF EDGEWATER, PETITIONER, v. DEPARTMENT OF TAXATION AND FINANCE, DIVISION OF TAX APPEALS, AND SOCONY-VACUUM OIL CO., INC., RESPONDENTS.

Argued October 1, 1946—Decided December 13, 1946.

Before Justices BODINE, PERSKIE and WACHENFELD.

For the petitioner, *Milton T. Lasher*.

For the respondents, *J. Vincent Barnitt*.

The opinion of the court was delivered by

PERSKIE, J.   The question for decision is whether the oil assessed while in the Borough of Edgewater had acquired a taxable *situs* therein or was still in the course of interstate commerce?

The facts are free from substantial dispute.   Two assessments were levied by the local assessors against oil of Socony-

Vacuum Oil Co., Inc. (hereafter called Company), while same was in the Borough of Edgewater (hereafter called Borough). One assessment was for the year of 1943 in the sum of $26,500 and the other was for the year of 1944 in the sum of $11,000. On appeal to the Bergen County Board of Taxation, that body sustained the 1943 assessment but canceled the 1944 assessment. The Company appealed the 1943 assessment and the Borough appealed the 1944 assessment to the Division of Tax Appeals. Both appeals were heard together. The Division of Tax Appeals concluded both assessments were invalid because "the oil levied was in transit through the state and not subject to taxation in the state." Accordingly, it reversed the judgment of the Bergen County Board of Taxation which sustained the 1943 assessment, and affirmed the judgment which canceled the 1944 assessment. State Board of Tax Appeals, *Socony-Vacuum Oil Co., Inc., v. Edgewater,* 23 *N. J. Mis. R.* 199; 42 *Atl. Rep.* (*2d*) 775. The Borough seeks a writ of *certiorari* and has stipulated with the Company that if the writ is allowed that we consider it on the merits. In light of the federal issue involved we shall consider and determine the cause in accordance with the stipulation.

The Company owns an oil refinery situate on the East River, Kings County, New York. Prior to World War II it transported its "cracking stock," a partially refined crude oil, in tankers from the oil fields in Texas and Oklahoma to its refinery and there the "cracking stock" was fed to the Houdry catalytic plant to be manufactured into 100 octane aviation fuel. Ordinarily this stock was transported in tankers by sea to the New York refinery. But since the Company lost so many of its tankers in 1942 and 1943 as the result of attacks made upon them by enemy submarines, the Company was compelled to ship its stock by railroad in tank cars. Such cars arrived in New Jersey on the west side of the Hudson River and would thereafter be taken by car float across the river to New York. But the war greatly increased the traffic into New York Harbor, and it created a demand for car floats in excess of the number available. Thus the United States Office of Defense Transportation requested

the Company to empty the tank cars of the "cracking stock" by placing same in a tank in New Jersey so that the cars could be quickly returned to the Company's oil fields for more oil.. The Company promptly complied with that request. When the crude oil arrived at its refinery in New York, the Company worked day and night to process same to produce a 100 octane fuel which, when so processed, was purchased by the United States for the use of the Army and Navy "to the exclusion of any other disposition thereof."

Accordingly, the Company in 1942 leased from Valvoline Oil Company its 550,000 barrel stationary oil tank in Edgewater with the agreement that this tank would be used exclusively by the Company for the purpose of unloading the oil into the leased tank and thus the tank cars would be free—as already observed—to return to the oil fields for more oil. It was further agreed that the oil in the tank would be transported in barges to New York except for small quantities which would be taken in railroad tank cars. It was estimated that about thirty tank cars a day would be required for unloading. The Valvoline Oil Company agreed to furnish those facilities. This lease was renewed for the year of 1943. Pursuant to the stated arrangements, the oil from the leased tank was transferred to the oil barges with reasonable promptness as fast as a good sized barge load could be accumulated and then it was taken to the Company's refinery in New York. It is important to note that nothing was done to the oil, save as above indicated, while in the Borough. It was not sold in New Jersey. It was not sold to the United States until after it had been processed in New York.

Our answer to the posed question is that the oil was still in interstate commerce. As stated by Mr. Justice McKenna in *General Oil Co.* v. *Crain,* 209 *U. S.* 211, \*229; 52 *L. Ed.* 754, 764, 765, the beginning and ending of transportation which constitutes interstate commerce are easy to mark. The beginning is defined to be the point of time when the property is committed to the carrier for transportation to the state of its destination, or started on its ultimate passage. *Coe* v. *Errol,* 116 *U. S.* 517; 29 *L. Ed.* 715. And the ending is defined to be the point of time when it arrives at its destination.

*Brown* v. *Houston,* 114 *U. S.* 622; 29 *L. Ed.* 257. If the movement of the property is unbroken, is actually in transit in interstate commerce, the law is clear; the property is not subject to local taxation. If, however, the movement of the property is broken, is delayed, then the question of whether it is subject to local taxation depends upon the facts of each particular case under consideration. What was the reason for the interruption, break or delay in the movement of the property? A temporary halt in the movement of the property due to natural causes or lack of facilities for transportation renders the property free from local taxation. *Cf. State, Detmold, Prosecutor,* v. *Engle,* 34 *N. J. L.* 425; *State, Lehigh and W. Coal Co., Prosecutors,* v. *Carrigan,* 39 *Id.* 35; *Lehigh and Wilkes-Barre Coal Co.* v. *Junction,* 75 *Id.* 922; 66 *Atl. Rep.* 923; *Independent Warehouse, Inc.,* v. *Scheele,* 134 *N. J. L.* 133, 140, 141; 45 *Atl. Rep.* (2d) 703; *Kelley* v. *Rhoades,* 188 *U. S.* 1; 47 *L. Ed.* 359.

Here the facts disclose that the oil was not stored in the Borough for business purposes and profits by the Company. *General Oil Co.* v. *Crain, supra.* The oil was transferred for shipping purposes from the Borough with reasonable promptness. The form of the oil was not changed, nor was it sold or offered for sale in New Jersey. *Cf. Minnesota* v. *Blasius,* 290 *U. S.* 1; 78 *L. Ed.* 131. The oil was not stored for an indefinite period of time, to be handled and distributed in the finished product from the Borough, subject to anticipated orders. *Susquehanna Coal Co.* v. *South Amboy,* 228 *U. S.* 665; 57 *L. Ed.* 1065; *Bacon* v. *Illinois,* 227 *U. S.* 504; 57 *L. Ed.* 615.

The oil had to be finally processed in New York before it was purchased by the United States government. The interstate movement before sale was not complete. *Cf. South Pacific Co.* v. *Gallagher,* 306 *U. S.* 167; 83 *L. Ed.* 586; *Texas and N. O. B. R. Co.* v. *Sabine Tram Co.,* 227 *U. S.* 111; 57 *L. Ed.* 442, and *Carson Petroleum Co.* v. *Vial,* 279 *U. S.* 95; 73 *L. Ed.* 626. In the last cited case it was held, per Chief Justice Taft, that oil bought for foreign export is not, while in storage tanks in a state other than that where the purchase is made, awaiting ships or the accumulation of

a cargo, subject to taxation by such state, although the exact point of destination is not fixed and the ships are loaded from bulk without separation of the various shipments from the points of origin. That holding was based upon the following circumstances (*pp.* 108-109): "* * * the delay in transshipment was due to nothing but the failure of the arrival of the subject to be shipped at the same time as the arrival of the ships at the port of transshipment. * * * The quickness of transshipment * * * was the chief object * * * plainly sought. * * * the selection of the point of shipment and the equipment at that point, were solely for the speedy and continuous export of the product abroad and for no other purpose. No * * * oil was sold there but that to be exported."

The facts in the case at bar are far more compelling than those in any of the cited cases. The request of the federal agency that the Company expedite the transportation of the oil in the manner it suggested was tantamount to an order. The Company promptly obeyed that order. In so doing, it did what each loyal American did to help our government defeat our enemy as quickly as possible. The oil, in the circumstances exhibited, was in interstate commerce. It constituted no part of the taxable personal property of the Borough.

The judgments under review are affirmed. Let a writ be issued, and a return made thereto, in accordance with the stipulation between the parties. The writ will then be dismissed, with costs.