In the Matter of NIAGARA JUNCTION RAILWAY COMPANY, Petitioner, against EUGENE T. CREAGH, as Comptroller of the City of Niagara Falls, Respondent.

Fourth Department, July 13, 1956.

*Clarence R. Runals* for petitioner.

*Clarence W. Greenwald, Corporation Counsel (Sigismund M. Lopacki* of counsel), for respondent.

BASTOW, J.   Pursuant to the authority granted by chapter 278 of the Laws of 1947, as amended, the Niagara Falls City Council in 1951 enacted Local Law No. 1 imposing a retail sales tax and Local Law No. 2 imposing an excise tax for the privilege of using within the city any article of tangible property purchased at retail.   Both of these laws became effective on March 1, 1951.   Pursuant to authority granted therein certain regulations were promulgated by the city comptroller.

This proceeding was instituted to review a determination of the comptroller imposing upon the petitioner an excise tax in the sum of $13,492.02 for the privilege of using within the

city of Niagara Falls seven locomotives. It appears from a statement of facts stipulated by the parties that in January, 1951 petitioner sought bids for certain locomotives. Several offers to sell were received and on February 23, 1951 petitioner accepted one of these. The seven locomotives were manufactured in Erie, Pennsylvania and shipped to petitioner at Niagara Falls during the quarter ended August 31, 1952. By writing submitted to this court subsequent to oral argument it was stipulated by the parties that title to the locomotives passed to petitioner after March 1, 1951 — the effective date of the local laws.

The petitioner, a domestic corporation, owns and operates a railroad as a common carrier for the transportation of freight for hire subject to regulation by the Interstate Commerce Commission as to rates and service. The petitioner owns no cars and its locomotives are used solely for the purpose of switching freight cars owned by other carriers to and from various industries located within the city of Niagara Falls and one industry in the adjoining town of Niagara. None of the locomotives crosses any State line and petitioner's sole contact with interstate commerce is that some of the freight cars switched by it come from or depart for points outside of this State either before petitioner's operations commence or are concluded. Approximately 80% of loaded cars switched by petitioner in the years 1951 to 1953, inclusive, had prior thereto moved in interstate or foreign commerce. After freight cars are unloaded by the various industries the empty cars are returned by petitioner to the railroad from which petitioner received the loaded cars. Receipt of loaded cars and delivery of empty cars is made by petitioner to the various railroads it serves at an interchange point in the city of Niagara Falls.

The two local laws, to which reference has been made, require no extended discussion. They follow the authorized pattern of the enabling act (L. 1947, ch. 278, as amd.). The basic sales tax law is complemented by the compensating use tax law which defines " use " as the " exercise of any right or power over tangible personal property by the purchaser thereof and includes but is not limited to the receipt, storage or any keeping or retention for any length of time ". A sale or purchase is defined in part as " [a]ny transfer of title or possession or both * * * for a consideration ". (Local Laws, 1951, No. 2 of the City of Niagara Falls, § 1, subds. [a], [b].)

Both parties in their respective briefs devote considerable space to a discussion of the right to impose the tax in view of

the fact that a contract of purchase and sale was made prior to the enactment of the local laws. It would seem that this point becomes academic in the light of the concession first made upon oral argument and subsequently, as heretofore stated, reduced to a written stipulation that title to the locomotives passed subsequent to the effective date of the local law. Moreover, possession by petitioner was not had until more than a year after the law became effective. The tax is imposed on the use of any property " purchased at retail " (§ 2) and a purchase is defined as " Any transfer of title or possession or both " (§ 1, subd. [b]). Similarly, the sales tax is levied upon " Any transfer of title or possession or both ". (§ 1, subd. [e].) While subdivision (b) of section 1 of the use tax law defines a sale as " [a]ny transfer of title or possession or both,  *   *   * or any agreement therefor " it seems plain from the record that the tax was levied upon the transfer of title and possession which took place after the effective date of the tax and not upon the contract which may have been made prior to March 1, 1951. Therefore it is unnecessary to explore the legal effect of the contract of purchase and sale. We conclude that the personalty was not exempt from the tax because of the pre-existing contract or by reason of any exemption relating thereto contained in the law.

The petitioner further contends that inasmuch as the contract contemplated and necessarily involved the shipment of the locomotives from outside of this State the sale is exempt from taxation by virtue of the provisions of regulation 41 implementing the Sales Tax Law. Our attention is directed to that portion thereof stating that the " tax is also imposed upon receipts from the sale of tangible personal property in the city where the vendor delivers the property therein from without [this State] if the facts and circumstances indicate that the contract of sale did not require, contemplate or necessarily involve the shipment of the goods from outside the State." Petitioner contends that its contract of sale plainly showed that a shipment of the locomotives from without the State was required. The fact is overlooked, however, that this regulation relates to the duty of a vendor to collect a sales tax. While it is true that no special regulations were adopted in connection with the use tax and all regulations concerning the sales tax were promulgated as to the use tax, regulation 81 states that this was done only " so far as applicable and with such changes as are necessarily implied ". We find regulation 41 to be here inapplicable. In passing it should be noted that insofar as

here pertinent it is copied verbatim from regulation 40 of the model retail sales tax regulations prepared by the State Tax Commission pursuant to section 7 of chapter 278 of the Laws of 1947. (See Prentice-Hall, State & Local Taxes [New York], §§ 69,500, 69,584.)

The principal thrust of petitioner's attack against the assessment is based upon the contention that it is null and void (a) because it purports to lay a tax upon an instrumentality of interstate commerce in violation of the commerce clause of the Federal Constitution and (b) because the State enabling law and the two local laws arbitrarily and unreasonably discriminate between instrumentalities of interstate and foreign commerce by purporting to exempt from taxation certain commercial vessels and to tax locomotives in contravention of the inhibitions of the State and Federal Constitutions against denial of the equal protection of the laws.

At the outset it is important to keep in mind the kind of a tax with which we are here concerned. This is particularly true when considering decisions construing statutes of this and other States. While sales and use taxes are both excise taxes, the former has a more general connotation than the latter. Precisely speaking — at least in this jurisdiction — a sales tax is imposed on sales and measured by sales. A " privilege " tax imposed on the privilege of doing business may be measured by sales or by gross receipts, including sales. Thus, the City of New York imposes a gross receipts tax (Administrative Code of City of New York, ch. 41, tit. RR) for the privilege of doing business within that city. " It is not an income tax, an ad valorem property tax, nor is it a tax in lieu of other taxes for the use of facilities within the city." (*Matter of United Air Lines* v. *Joseph,* 282 App. Div. 48, 51–52, affd. 307 N. Y. 762.)

This statement of recognized fundamentals in this area of the law would ordinarily be unnecessary but in the city's brief we find the statement that " the imposition of the use tax is * * * on the privilege of the corporation doing business within the State of New York ". To the contrary this typical use tax is not imposed for the privilege of doing business but is designed to compensate the sales tax. It applies to the " use " of property purchased rather than to the act of purchase. Its purpose is to complement the sales tax by permitting the taxation of property brought into and used within the limits of the taxing authority under circumstances that prevent the collection of the sales tax. The tax has sometimes been referred to as one levied on the privilege of ownership or possession

in the storage, use or consumption of tangible property within the taxing area.

It has been written that " [c]ompensating use taxes imposed upon the use of chattels which have ceased to be in transit are now so common that their validity has been virtually removed from the area of judicial controversy, both as to due process and interstate commerce clause ground. When articles have reached the end of their interstate movement and before their use or consumption in the intended interstate operation has begun, even though they are at rest for only a brief pause, there is a taxable moment in which the use tax can validly attach. (Hartman on State Taxation of Interstate Commerce, p. 171.)

The landmark authority is *Henneford* v. *Silas Mason Co.* (300 U. S. 577). There contractors and subcontractors had purchased machinery and supplies at retail in other States and brought them into the State of Washington for use in the construction of a dam. It was held that a compensating use tax levied upon the property was not a tax upon the operation of interstate commerce but upon the privilege of use after such commerce was at an end. It was said (p. 582) that " [t]hings acquired or transported in interstate commerce may be subjected to a property tax, non-discriminatory in its operation, when they have become part of the common mass of property within the state of destination.  *  *  *  For like reasons they may be subjected, when once they are at rest, to a non-discriminatory tax upon use or enjoyment."

This decision, of course, is authority only for the validity of the tax when the property has come to rest in the taxing State free from any further entanglement with interstate commerce. Three years later in *Southern Pac. Co.* v. *Gallagher* (306 U. S. 167) the court was confronted with a case where the personalty was not only purchased outside of the taxing State but the consumer taxpayer was engaged in intrastate, interstate and foreign commerce business. The extrastate purchases of tangible personalty for the operation of a railroad consisted of rails, equipment, machinery, tools and office supplies. Concededly no new rolling stock was involved. But the major purchases of rails, repair parts and supplies were adapted only to railroad use. Storage of the personalty was merely incidental to protection until use and " the movement from loading to final placement [of special orders] is as nearly continuous as managerial efficiency can contrive." (P. 173.) In holding the use tax was legally imposed and did not constitute an unlawful burden upon interstate commerce the court· said

(pp. 176–178) : "In the present case some of the articles were ordered out of the state under specification suitable only for utilization in the transportation facilities and installed immediately on arrival at the California destination. If articles so handled are deemed to have reached the end of their interstate transit upon 'use or storage,' no further inquiry is necessary as to the rest of the articles which are subjected to a retention, by comparison, farther removed from interstate commerce. We think there was a taxable moment when the former had reached the end of their interstate transportation and had not begun to be consumed in interstate operation. At that moment, the tax on storage and use — retention and exercise of a right of ownership, respectively — was effective. The interstate movement was complete. The interstate consumption had not begun. * * * The prohibited burden upon commerce between the states is created by state interference with the commerce, a matter distinct from the expense of doing business. A discrimination against it, or a tax on its operations as such, is an interference. A tax on property or upon a taxable event in the state, apart from operation, does not interfere. This is a practical adjustment of the right of the state to revenue from the instrumentalities of commerce and the obligation of the state to leave the regulation of interstate and foreign commerce to the Congress."

At the same term *Pacific Tel. Co.* v. *Gallagher* (306 U. S. 182) was decided. There the court upheld the constitutionality of a California statute imposing a storage and use tax upon equipment, apparatus, materials and supplies purchased outside and shipped into the State by a telephone and telegraph company in the operation, maintenance and repair of its interstate system. Some of the equipment was purchased on specific order and consisted of central office switchboards and other component parts of telephone and telegraph lines. The court said that after the termination of the interstate shipment and before the use or consumption of the mixed interstate and intrastate system, the corporation exercised two rights of ownership in California — retention and installation.

Thus, we see that the rationale of these cases was the finding of a taxable local event, separate and distinct from interstate commerce, as distinguished from an excise tax imposed upon the privilege of using instrumentalities inseparable from interstate commerce by a railroad interstate carrier in the transaction of its transportation business. This distinction is pointed up in the local statute (§ 1, subd. [a]) which defines "use," among

other things, as the " receipt " of tangible personal property as well as the storage, keeping, installation, consumption or use thereof.

It is tempting to here digress and discuss some of the authorities in the field of gross receipts taxation but it would extend this opinion beyond a reasonable length. The subject has been recently discussed and the decisions of the United States Supreme Court analyzed in an illuminating opinion by Mr. Justice Breitel in *Matter of United Air Lines* v. *Joseph* (282 App. Div. 48, affd. 307 N. Y. 762, *supra*). Attention should be directed, however, to one decision in this area of the law that sheds some light by analogy to the problem presented. In *Interstate Pipe Line Co.* v. *Stone* (337 U. S. 662) the court by a five to four decision upheld a tax imposed by Mississippi upon gross receipts of a foreign corporation, which owned and operated pipe lines used to transport oil from fields within the State to loading platforms adjacent to railroads within the State for loading in tank cars and shipment to points outside the State. One Justice voted to uphold the tax on the ground that the event taxed was local activity. Four of the Justices voted to sustain the tax without pausing (p. 666) " to consider whether the business of operating the intrastate pipe lines is interstate commerce, for, even if we assume that it is, Mississippi has power to impose the tax ". They went on to say (p. 667–668) that " [s]ince all the activities upon which the tax is imposed are carried on in Mississippi, there is no due process objection to the tax. The tax does not discriminate against interstate commerce in favor of competing intrastate commerce of like character. The nature of the subject of taxation makes apportionment unnecessary; there is no attempt to tax interstate activity carried on outside Mississippi's borders. No other state can repeat the tax. For these reasons the commerce clause does not invalidate this tax." It is recognized that the decision upon this phase of the case was undecisive but the quoted portion of the views of four members of the court are particularly applicable to the facts in the instant case.

Thus, it seems that the problem posed is whether these locomotives may be found to be so distinct from interstate commerce as to permit the tax on the " local event " theory or on the other hand that the " event " is so inseparably intertwined with interstate commerce as to be a part of it. Petitioner relies heavily upon *Union Pac. R. Co.* v. *Utah State Tax Comm.* (110 Utah 99). There it appeared that the railroad company at some unspecified prior date purchased eight locomotives. They

were used in Nebraska in *switching and hauling* of interstate cars and intrastate cars. Subsequently they were transferred to the company's Salt Lake City terminal when they were used in the *switching* of interstate cars and intrastate cars. Utah assessed a use tax based upon the purchase price of the locomotives. It attempted to justify such action on the theory that when the locomotives were withdrawn from interstate commerce in Nebraska and assigned for use in Utah there came a taxable moment when Utah acquired jurisdiction to assess the use tax. The court in a unanimous decision invalidated the assessment. Three opinions were written. It would seem that a portion of the short concurring opinion of Mr. Justice WOLFE points up the distinguishing features between that decision and the case at bar. It was written (p. 108) that " [t]he movement from Nebraska to Utah and the subsequent use of the engine in Utah was a total and continuous interstate operation. The mere fact the the engine rested at Salt Lake City after one movement in interstate commerce for refueling and inspection was not a non-interstate interlude in continuous interstate operation, but was a part of interstate operation sandwiched between two movements in interstate operation. It was itself a part of and incidental to total and continuous interstate operation. I am somewhat surprised that the point had to be labored to the extent it has been. It appears to me quite obvious."

Thus, it seems that the events upon which Utah attempted to impose a use tax were " so inseparably intertwined with interstate commerce, as to be a part of it." (*Southern Pac. Co.* v. *Gallagher,* 306 U. S. 167, 178, *supra.*) On the other hand the locomotives purchased by petitioner while related to a current of interstate commerce confined their activities to the county of Niagara in general and with one exception to the city of Niagara Falls. The personalty had " become part of the common mass of property " of petitioner within this State. There was within the fair intentment of the doctrine enunciated in *Southern Pac. Co.* v. *Gallagher* (*supra*) a taxable moment when the interstate transportation of the locomotives from the seller in Pennsylvania to the petitioner in this State was ended. At that moment the tax on the " receipt " and " the exercise of any right or power " over this personal property became effective. The interstate movement was complete. The related activity to the current of interstate commerce had not commenced. Moreover, the rails taxed in *Southern Pac. Co.* v. *Gallagher* (*supra*) and the central switchboards taxed in *Pacific Tel. Co.* (*supra*) except for their short " rest," which was " as nearly

continuous as managerial efficiency can contrive " became upon installation " inseparably intertwined " with the interstate commerce activities of these public utilities. In the instant case we need not strive as did the taxing authority in *Union Pac. R. Co. v. Utah State Tax Comm. (supra)* to find a taxable local event, distinct from the general interstate commerce which if taxed by one State might be subjected to a multiple burden by all, because all of the activities of petitioner occur wholly within the State of New York. For that reason, and also because of the credit which the taxing statute allows, there is no danger of multiple taxation. Neither is there any necessity of apportionment, which is designed to allocate an interstate business among the various States in which it is done, because there is only one State involved. Paraphrasing what was said in *Interstate Pipe Line Co. v. Stone (supra)* the tax does not discriminate against interstate commerce in favor of competing intrastate commerce of like character. There is no attempt to tax interstate activity carried on outside of New York's border. No other State can repeat the tax. For these reasons the commerce clause does not invalidate this tax.

The petitioner stresses the fact that it is subject to regulation as to rates and service by the Interstate Commerce Commission with which its tariffs are filed. It is recognized that the use of these locomotives is not exclusively " incidents apart from the flow of the interstate commerce." A major part of loaded cars transferred are from outside of the State. But the States may often tax aspects of what Congress may regulate (*Minnesota v. Blasius,* 290 U. S. 1; *Coverdale v. Pipe Line Co.,* 303 U. S. 604). In the *Minnesota* case (*supra,* pp. 7–8) it was said: " The dealings at the South St. Paul stockyards including the transactions of Blasius, as described in these findings, manifestly were so related to a current of commerce among the States as to be subject to the power of regulation vested in the Congress. * * * But because there is a flow of interstate commerce which is subject to the regulating power of the Congress, it does not necessarily follow that, in the absence of a conflict with the exercise of that power, a State may not lay a nondiscriminatory tax upon property which, although connected with that flow as a general course of business, has come to rest and has acquired a situs within the State."

Here we find a taxable local event separate and distinct from interstate commerce. Taxation by the States of the business of interstate commerce is forbidden only because it is deemed an interference with that commerce, the uniform regulation of

which is necessarily reserved to the Congress (*Coverdale* v. *Pipe Line Co., supra*, p. 610). We conclude that this tax assessed upon this domestic corporation carrying on its activities solely within one county of this State and only casually touching the main stream of interstate commerce is not violative of the commerce clause of the Federal Constitution.

Lastly, the petitioner contends that the assessment is null and void because these local laws and the State enabling act (L. 1947, ch. 278, as amd.) contain discriminatory provisions. This claim is based on the exemption from the tax of " receipts from sales of commercial vessels primarily engaged in interstate or foreign commerce and property for the use of such vessels for bunker and galley fuel, provisions, supplies, maintenance and repairs " (L. 1947, ch. 278, as amd.; L. 1948, ch. 651; Local Laws, 1951, No. 1 of the City of Niagara Falls, § 2, subd. [a]; Locals Laws, 1951, No. 2 of the City of Niagara Falls, § 3, subd. [d]). In substance the Legislature by the 1948 amendment withdrew from the municipalities authorized to impose sales and use taxes by the 1947 enactment the power to tax receipts from sales of commercial vessels primarily engaged in interstate commerce and certain property used in connection therewith. It is difficult to see how this was a discriminatory act against land carriers such as petitioners. Generally speaking, Legislatures have wide discretion as to classification for exemption from taxation, so long as they are reasonable and operate uniformly on all within the same class. It is recognized that if taxes such as these are inequable or discriminating between particular persons or classes, they are void as violative of the constitutional provisions affording equal protection of the law. The claim of petitioner is that the statute unreasonably discriminates, not against interstate commerce, but against carriers by land, because commercial vessels are exempted. We conclude that the classification was reasonable and not arbitrary and rested upon a ground of difference having a fair and substantial relation to the object of the legislation.

The determination of the comptroller should be confirmed.

VAUGHAN, J. (dissenting). It strikes me we are going a long way in holding that the " come to rest " doctrine is applicable to the facts disclosed by this record. (See *Union Pac. R. Co.* v. *Utah State Tax Comm.*, 110 Utah 99.) True it is, the locomotives involved completed their initial interstate journey from Erie, Pennsylvania, upon their delivery to the petitioner at Suspension Bridge but should we not consider other circumstances?

The locomotives when ordered were for use at the Niagara junction railway yards for the purpose of placing cars that came into Niagara Falls for delivery to the various industrial plants and transferring cars from such plants to the connecting carriers serving the Niagara Falls district for transportation to destinations without the State.

It is stipulated that the locomotives, with one exception, operate solely within the city of Niagara Falls and none cross State lines. It does not follow, however, that such activity is local in nature and that the locomotives are not engaged primarily in interstate commerce in switching cars from the various industries to connecting carriers which, in turn, transport the cars without the State. As a matter of fact, it is stipulated that 81% of the loaded cars switched by petitioner, moved in interstate commerce.

Relator admits that respondent is subject to regulations as to rates and services by the Interstate Commerce Commission with which tariffs are filed. In the face of such undisputed facts, I seriously doubt if we can completely disregard the nature of the work in which the locomotives were engaged, and hold that the use tax is not a direct tax on interstate commerce. Respondent urges that it is a tax "on the privilege of the corporation doing business within the State of New York". With such contention I agree.

*Southern Pac. Co.* v. *Gallagher* (306 U. S. 167) involved the applicability of the California use tax to tangible personal property purchased without the State of California by the Southern Pacific Company, an interstate railroad, and installed or stored for future use as a part of its transportation facilities. The court upheld the tax on the ground that it was upon the "use and storage" of the articles purchased without the State before their consumption in interstate commerce had begun. The court was careful to point out that no new rolling stock was involved. It was then held that the tax was upon the local storage and installation of parts which, once installed, moved again in interstate commerce. Obviously this rationale cannot apply to new rolling stock, such as is involved in the present case, and in indicating that a tax on operation — and that is all we have in this case — would be bad, the Supreme Court clearly recognized the difference between parts or supplies withdrawn from local storage and installed, on the one hand, and rolling stock actually moving and functioning as an instrumentality of interstate commerce, on the other. The court also was careful to point out that "The prohibited burden upon commerce between the states is created by state interference

with that commerce, a matter distinct from the expense of doing business. A discrimination against it, or a tax on its *operation* as such, is an interference. A tax on property or upon a taxable event in the state, *apart from operation,* does not interfere '' (emphasis supplied) (pp. 177–178).

In the instant case, the tax imposed is '' an excise tax for the privilege of using within such city [Niagara Falls] any article of tangible personal property purchased at retail '' (Local Laws 1951, No. 2 of City of Niagara Falls). The tangible personal property sought to be used is locomotives engaged in interstate commerce. The tax imposed is a direct burden upon the privilege of engaging in such commerce, and in my opinion, cannot be upheld upon the theory that it is a local activity in which the relator is engaged. The activity is interstate commerce in its most obvious form. The tax is upon the operation of petitioner's railroad and constitutes a direct burden upon commerce between the States, and in my view cannot be sustained.

The purported assessment is null and void and should be annulled and the sum deposited by petitioner with respondent under protest directed to be refunded, with costs of this proceeding.

All concur, except VAUGHAN, J. P., who dissents and votes to annul the determination, in a separate opinion. Present — VAUGHAN, J. P., KIMBALL, WHEELER, WILLIAMS and BASTOW, JJ.

Determination of the comptroller confirmed, with $50 costs and disbursements.