Joseph P. Abraham and Stasia J. Abraham v. Commissioner.
Abraham v. Commissioner
Docket No. 5121-67.
United States Tax Court
T.C. Memo 1970-304; 1970 Tax Ct. Memo LEXIS 55; 29 T.C.M. (CCH) 1401; T.C.M. (RIA) 70304; November 2, 1970, Filed Philip D. Caloger, 77 W. Washington, Chicago, Ill., for the petitioners. Nelson E. Shafer, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1955 through 1960 and additions to tax as follows: Year
Deficiency
Addition to Taxunder§ 6653(b)
1955
$ 44,292.41
$ 22,146.21
1956
90,526.60
45,263.30
1957
75,522.46
37,761.23
1958
41,401.91
20,700.96
1959
34,775.30
17,387.65
1960 30,496.25
15,401.71
$317,014.93
$158,661.06
The parties having stipulated with regard to some of the respondent's determinations, the issues remaining for decision relate to the disallowance of claimed business expenses, the taxability of certain bank 1402 deposits, the basis of a partnership interest sold in 1958 and whether any part of any underpayment of tax was due to fraud. Findings of Fact Most of the facts have been stipulated and are incorporated herein by this reference. Petitioners are husband and wife and at the time their petition was filed herein resided in Glen Ellyn, Illinois. They *57 filed joint Federal income tax returns for the taxable years 1955 through 1960 with the district director of internal revenue, Chicago, Illinois. Hereinafter, Joseph P. Abraham will be referred to as the petitioner. Throughout the years in question, the petitioner, as sole proprietor, operated an advertising agency under the name of Joseph P. Abraham and Associates. His two principal clients were Lurie Brothers, hereinafter referred to as Lurie, and Bruno's Appliance and Furniture Center, hereinafter referred to as Bruno's. Both Lurie and Bruno's were retail appliance dealers located in Chicago. Petitioner placed advertising for Lurie and Bruno's principally with radio station WEAW which was operated by the North Shore Broadcasting Company, Inc. of Evanston, Illinois. During the years 1955 and 1956 the North Shore Broadcasting Co., Inc. charged petitioner $0.60 for each radio advertisement and during the years 1957 through 1960, $0.65 for each advertisement. Such company submitted invoices to petitioner for the radio advertisements and was paid by petitioner. Petitioner, pursuant to an understanding with Bruno's and Lurie, then prepared and submitted to Bruno's and Lurie invoices *58 bearing the name "WEAW Radio Broadcaster's Company," in which the radio advertisements were billed at $6 each and the number of advertisements billed varied from about 1 1/2 to several times the actual number of advertisements made by WEAW. Bruno's and Lurie then paid petitioner approximately 1/2 of the amounts billed to them. For example, in November 1958 WEAW made 697 advertisements for Bruno's for which the petitioner was billed $453.05. However, the invoice prepared by petitioner stated that 2,501 advertisements had been made during that month for which he billed Bruno's $15,006. Bruno's then paid petitioner $8,316 for such advertising. During the years in question the manufacturers of the appliances sold by Bruno's and Lurie had a cooperative advertising arrangement whereby such manufacturers agreed to make reimbursement of a percentage, generally 50%, of the cost incurred in advertising their products. As a result of the inflated invoices prepared by the petitioner the manufacturers paid at least the full cost of the advertising and often much more than the full cost. During the years 1955 through 1960, petitioner also placed advertising for other clients with various newspapers, *59 publications, and other media. The various media submitted invoices to petitioner for such advertising and were paid by petitioner. Petitioner then submitted invoices to his clients and was paid by them for the services rendered. Throughout the years in question petitioner did not maintain any formal books or records with respect to the conduct of his business. He relied only on records of his bank account maintained at LaSalle National Bank of Chicago. On their returns for the taxable years 1955 through 1960 petitioners reported the following on "Schedule C: Profit (or Loss) From Business Or Profession": Year
TotalReceipts
Total ReceiptsLess AllowancesRebates & Returns
Total ** BusinessDeductions
Net Profit
1955
$10,335.00
$ 5,350.00
$4,985.00
1956
20,167.63
10,637.66
9,529.97
1957
* $ 141,421.00
21,213.00
11,260.00
9,953.00
1958
14,586.00
9,777.25
4,808.75
1959
10,725.00
6,120.79
4,604.21
1960
13,378.40
5,872.76
7,505.64
*60 1403 During the years 1955 through 1960, the petitioner's identified receipts from clients were as follows: Year
Bruno's
Lurie
Others
Total
1955
$51,641.00
$58,140.50
$ 649.13
$ 110,430.63
1956
94,607.00
70,736.40
165,343.40
1957
92,275.50
56,005.30
9,231.51
157,512.31
1958 71,096.00
18,742.34
5,723.00
95,561.34
1959
66,897.00
18,393.06
85,290.06
1960
65,931.00
2,834.40
68,765.40
The amount of claimed business expenses which the respondent allowed and the amount of additional expenses which the parties have stipulated for each of the taxable years 1955 through 1960 are as follows: Year
Amounts of ClaimedExpenses AllowedPer Notice ofDeficiency *
AdditionalExpenses PenStipulated Exhibits **
Total
1955
$2,950.00
$20,242.42
$ 23,192.42
1956
3,551.48
21,974.37
25,525.85
1957
4,260.00
22,267.70
26,527.70
1958
3,776.67
12,888.43
16,665.10
1959
2,700.00
17,200.58
19,900.58
1960
2,188.00
5,457.60
7,645.60
*61 On the basis of petitioner's identified business receipts and the above expenses, his net profit from the operation of such business during each of the years 1955 through 1960 was as follows: Years
Net Profit
1955
$ 87,238.21
1956
139,817.55
1957
130,984.61
1958
78,896.24
1959
65,389.48
1960
61,119.80
Prior to 1958 petitioner owned an interest in a partnership known as Catholic Publications Representatives, Chicago, Illinois. By an agreement dated January 24, 1958, he sold his interest in such partnership for $40,000 payable in weekly installments of $160. In such agreement, the $40,000 selling price was allocated $37,000 to goodwill and $3,000 to furniture and fixtures. In such agreement, the purchasers of petitioner's interest also agreed to assume and pay all the existing debts and obligations of the partnership. During the years 1958 through 1960, the aggregate amounts received by petitioner from the sale of his interest were as follows: Year
Sale Proceeds
1958
$7,040.00
1959
8,320.00
1960
2,080.00 Under the terms of such agreement, petitioner also received weekly fees in the amount of $140 as a consultant and advisor. *62 During the years 1958 through 1960, the aggregate amounts received by petitioner as consultation fees were as follows: Year
Fees
1958
$6,020.00
1959
7,420.00
1960
1,540.00
During the years 1955 through 1960 the petitioners maintained savings accounts at various savings institutions. During such years they received interest from such accounts as follows: Year
Interest
1955
$ 45.00
1956
195.91
1957
261.88
1958
361.84
1959
719.19
1960
819.92
On their returns for the years 1955 to 1960, petitioners reported adjusted gross income, taxable income, and tax liability as follows: Years
AdjustedGross Income
TaxableIncome
Tax Liability
1955
$4,985.00
$2,686.50
$ 537.30
1956
9,529.95
6,776.95
1,410.93
1957
9,553.00
6,797.70
1,415.49
1958
4,808.75
1,366.25
273.35
1959
$4,624.21
$1,501.71
$500.40
1960
7,955.64
475.80
95.16 1404 On their return for 1958 petitioners elected to report the gain from the sale of petitioner's partnership interest in Catholic Publications Representatives on the installment method. On such return, in computing the gain, they used a basis of $10,000 and a *63 selling price of $40,000. They therefore reported 75% of the payments received during 1958 and 1959 as long-term capital gain. On their return for 1960 they failed to report any gain with respect to the payments received during such year. In the notice of deficiency, the respondent determined that petitioners had not substantiated any basis in the partnership interest and determined that the full amount of the above payments represented long-term capital gain in the years received. On their returns for the years 1958 through 1960, petitioners failed to report the fees received by petitioner as a consultant during such years. In the notice of deficiency the respondent determined that such fees were includable in petitioners' taxable income during the years received. On their returns for the years 1955 through 1959, petitioners failed to report the interest received by them during such years. On their return for 1960, they reported interest income in the amount of $350. In the notice of deficiency the respondent determined that interest in the amounts stated hereinabove was includable in petitioners' taxable income in the years received. During the years 1955 through 1960 there *64 were total unexplained deposits made to petitioner's account at LaSalle National Bank of Chicago as follows: Year
UnexplainedDeposits
1955
$ 3,270.00
[1] 1956
12,289.18
1957
880.20
1958
2,945.96
1959
2,413.40
1960
7,459.74 The respondent determined that the above amounts of unexplained bank deposits made to petitioner's bank account during the years 1955 through 1960 represented additional taxable income to petitioners for such years. The respondent also determined that the petitioners were liable for additions to tax for fraud for each of the taxable years 1955 through 1960. On or about March 30, 1961, petitioner was indicated in the United States District Court for the Northern District of Illinois for making a false claim in a bankruptcy proceeding in violation of section 152, Title 18, of the United States Code. On or about May 26, 1964, petitioner was found guilty as charged, *65 convicted, and sentenced to 18 months imprisonment. That conviction was affirmed on appeal. United States v. Abraham, (C.A. 7) 347 F. 2d 395. On or about January 16, 1964, petitioner was indicted in the United States District Court for the Northern District of Illinois for attempting to evade income tax by filing false and fraudulent joint income tax returns for each of the years 1957 through 1960 in violation of section 7201, Title 26, of the United States Code. On or about October 5, 1965, petitioner was convicted upon his plea of guilty and sentenced to 18 months imprisonment, such sentence to run concurrently with the above-mentioned sentence imposed for filing a false claim in the bankruptcy proceeding. Some part of the underpayment of tax for each of the taxable years 1955 through 1960 was due to fraud. Opinion In determining the deficiencies herein, the principal adjustment made by the respondent was to the profit which petitioner derived from his advertising business. The petitioners had reported annual net profits from such business during the years in question ranging from approximately $4,600 to approximately $10,000. The parties have stipulated to *66 the amount of identified payments which petitioner received from clients. The respondent allowed portions of the expenses claimed by the petitioners in their returns, and in addition, the parties have stipulated to additional expenses incurred by petitioner for radio and newspaper advertising. On the basis of identified amounts of receipts and the stipulated and allowed expenses, we have found annual net profits from the business during the years in question which range from about $61,000 to about $140,000. 1405 At the trial the petitioner testified that the income which he reported in his returns represented about 12 1/2 or 15 of his gross receipts. His testimony as to his reasons for reporting only such percentages was quite confusing and contradictory. At one point he stated, in effect, that such percentage represented the "normally accepted advertising commission" allowed by advertising media to a recognized advertising agency on the amount of advertising placed with such media. He testified, however, that the media do not allow commissions on local advertising, which was the type of advertising which he was placing. It is clear that such commissions were not the source *67 of petitioner's income. Rather, as pointed out in the findings of fact, his income was derived under arrangements with Bruno's and Lurie and other clients. Thus, it is obvious that the "normally accepted advertising commission" had no bearing upon the computation of petitioner's income. At another point he testified to the effect that he considered that 15% of his gross receipts represented his estimated profit, and that the remaining 85% represented his cost of doing business. He further stated that the specific expenses which he claimed as deductions on his returns for the years in question represented expenses "over and above" his "normal expenses." He also stated that the expenses were, in part, estimates and that he actually incurred more expenses than he had claimed on his returns. In this connection he testified that although he had no permanent employees during the years before us, he had employed from 50 to 75 persons on a part-time basis for various advertising work, such as art work and copy work. However, he could not specify any of the expenses incurred during the years before us, nor could he identify any of the individuals who had worked for him. Nor did he maintain *68 any records of his business expenses during the years before us. The burden of proof rests upon the petitioners. Welch v. Helvering, 290 U.S. 11. In view of the above, it is clear that the petitioners have failed to establish that they are entitled to any greater amounts of business expenses than those allowed by the respondent and those stipulated by the parties. See Chesbro v. Commissioner, (C.A. 2) 225 F. 2d 674, affirming 21 T.C. 123. The respondent also determined that unexplained deposits made to petitioner's bank account represented additional income to petitioners for each of the years 1955 through 1960. At the trial petitioner testified that such unexplained deposits did not represent additional income to him. He stated, in effect, that he allowed his brother-in-law to utilize his bank account for various business transactions so that his brother-in-law could take advantage of petitioner's advertising agency recognition for credit purposes. He further testified, in effect, that such account during the years in question was subject to a tremendous amount of turn-over because of these transactions and other accommodations made by him, *69 and that, therefore, he could not identify the deposits made to such account during any particular year. None of petitioner's testimony was corroborated by other affirmative evidence, and considering the indefinite nature of his testimony with respect to this issue, we cannot hold that the respondent was in error in determining that unexplained bank deposits represented additional income to petitioners during the years before us. Petitioner directed our attention to the year 1956 during which the total amount of $155,798.58 was deposited to his account. The record establishes that 28 or 29 deposits were made to his account during such year, of which 22 deposits, amounting to $143,249.40 or about 92% of total deposits, represented deposits of amounts identified as receipts by petitioner from Lurie or Bruno's. This, to us, belies petitioner's contention that his account was subject to a tremendous turnover during the years in question and that he could not, therefore, identify deposits which allegedly represented accommodation items or items attributable to his brother-in-law's utilization of his account. In view of the above, we approve the respondent's determination that unexplained *70 bank deposits in the amounts set forth in our findings represented additional income to the petitioners during the years 1955 through 1960. See Mills v. Commissioner, (C.A. 4) 399 F. 2d 744, affirming a Memorandum Opinion of this Court, and cases cited therein. The respondent disallowed the $10,000 basis which petitioners claimed for petitioner's partnership interest in Catholic Publications Representatives and therefore determined that petitioners realized greater capital gain upon the sale of such interest than they had reported for the years 1958 and 1959. At the trial petitioner testified that he had purchased his partnership 1406 interest in Catholic Publications Representatives from his brother for $10,000, and that such amount represented payment for fixtures, reimbursement for telephone deposits, and payment of his brother's obligations. Again, no corroborative evidence was adduced to support petitioner's testimony, and its conclusory nature does not afford any justification for disturbing the respondent's determination. In any event, it should be noted that a partner's basis in his partnership interest is continuously affected by many factors, including *71 the partnership's income, losses and liabilities and the distributions made. See, e. g., sections 705 and 752 of the Internal Revenue Code of 1954. Although petitioners stated in their 1958 return that the partnership interest in question was acquired in 1954, none of their returns for the years 1955 through 1957 make any mention of such interest. Under the circumstances, we have no way of ascertaining whether or not the petitioner had any basis in his interest in Catholic Publications Representatives at the time of its sale. Accordingly, the respondent's determination in this respect is approved. The parties have stipulated that petitioners, in the year 1960, received installment payments totaling $2,080 from the sale of the above partnership interest, but that they failed to report any gain in that year from the sale. We approve the respondent's determination that the amount of $2,080 constituted long-term capital gain to petitioners in that year. The parties have stipulated that in the years 1955 through 1960 the petitioners received interest income, as set forth in the findings, none of which was reported on their returns except $350 in the return for 1960. They have also stipulated *72 that in the years 1958 through 1960 petitioner received consultation fees, as set forth in the findings, none of which were reported in petitioners' returns for those years. Whether the petitioners are liable for additions to tax for fraud under section 6653 (b) of the Internal Revenue Code of 1954[2] is an issue of fact to be determined upon a consideration of the entire record. See William G. Stratton, 54 T.C. 255, and cases cited therein. Under section 7454(a) of the Code [3] the burden of proof with respect to fraud is upon the respondent. Fraud is never presumed. It must be affirmatively established by clear and convincing evidence. See Carter v. Campbell, (C.A. 5) 264 F. 2d 930; and William G. Stratton, supra.
*73 The petitioner Joseph P. Abraham, but not the petitioner Stasia J. Abraham, is estopped to deny liability for additions to tax for fraud for each of the years 1957 through 1960 by reason of his criminal conviction for attempting to evade income tax by filing false and fraudulent joint income tax returns for such years. See Henry M. Rodney, 53 T.C. 287, and cases cited therein. However, wholly apart from any issue with respect to collateral estoppel, the record as a whole clearly establishes that petitioners are liable for additions to tax for fraud for each of the years 1955 through 1960. The fraud contemplated by the statute is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. William G. Stratton, supra.While the mere understatement of income is not alone sufficient to establish fraudulent intent, consistent and substantial understatement of income over a number of years constitutes evidence upon which fraudulent intent may be properly inferred. Kurnick v. Commissioner, (C.A. 6) 232 F. 2d 678; Schwarzkopf v. Commissioner, (C.A. 3) 246 F. 2d 731; and Baumgardner v. Commissioner, (C.A. 9) 251 F. 2d 311, *74 all affirming Memorandum Opinions of this Court. Here, apart from any presumption in favor of any of the respondent's determinations, the record affirmatively establishes that the income and net profits petitioners derived from the operation of petitioner's advertising agency during each of the years in question were many times greater than the amounts 1407 they reported from such source. Petitioner's attempted explanation, heretofore described, of his method of determining his reportable taxable income was contradictory and evasive and, far from constituting a satisfactory explanation, convinces us that he was consistently attempting to conceal taxable income from his business and thereby avoid the tax thereon. In addition, the petitioners omitted other types of income, such as interest and consultation fees. These facts, coupled with the petitioner's failure to maintain adequate books and records, clearly and convincingly establish that some part of the underpayment of tax for each of the years 1955 through 1960 was due to fraud, and we have so found as a fact. Accordingly, the petitioners are liable for additions to tax under section 6653(b) of the Code for each of the years *75 1955 through 1960. See section 6013(d)(3) of the Internal Revenue Code of 1954. Decision will be entered under Rule 50. Footnotes
**. The deductions claimed by petitioners represented various amounts claimed for travel; entertainment and promotion; printing, cut and art work; telephone and telegraph expenses; automobile expenses and depreciation; parking expenses; rent; gifts; and commissions.↩
*. This figure was followed by the notation "at 15%." ↩
*. The respondent disallowed the expenses claimed with respect to travel; entertainment and promotion; printing, cut and art work; gifts; and commissions. ↩
**. These expenses represented costs incurred by petitioner for the purchase of radio advertising from WEAW and for the purchase of advertising space in various newspapers. Except for relatively insubstantial adjustments for additional expenses incurred during the years 1956 and 1957, such expenses were allowed by the respondent in determining the deficiencies in question.↩
1. In the year 1956, there were 28 or 29 deposits made to such account, totaling $155,798.58. Of these deposits, 22 totaling $143,249.40, were identified as receipts from Lurie and Bruno's. The record does not provide such complete detailed evidence as to the other years.↩
2. Section 6653(b) of the Code provides as follows: Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). ↩
3. Section 7454(a) of the Code provides as follows: Fraud. - In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.↩